695 A.2d 672

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JOHN W. DREHER, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 18, 1997—Decided June 20, 1997.

412

418

Before Judges MICHELS, MUIR, Jr., and KLEINER.

*Paul Mogin* (*Williams & Connolly*) of the Washington, D.C. bar, admitted pro hac vice, argued the cause for appellant (*Stern & Greenberg*, and *Mr. Mogin*, attorneys; *Mr. Mogin*, of counsel; *Marcie R. Ziegler*, *Dan S. Sokolov*, *Herbert J. Stern*, *Jeffrey Speiser*, and *Mr. Mogin*, on the brief).

*Joseph Connor, Jr.*, Assistant Prosecutor, and *Josephine R. Potuto*, Special Assistant Prosecutor, argued the cause for respondent (*John B. Dangler*, Morris County Prosecutor, attorney; *James A. Cannon*, *Thomas J. Critchley, Jr.*, and *John McNamara, Jr.*, Assistant Prosecutors, and *Mr. Connor and Ms. Potuto*, on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

Defendant appeals from his conviction of the purposeful and knowing murder of his wife. Defendant's previous conviction for this same crime resulted in a reversal on appeal and a remand for a new trial.

On this second appeal, defendant raises the following points of error:

I. THE TRIAL COURT IMPOSED ERRONEOUS RESTRICTIONS ON THE CROSS-EXAMINATION OF NANCE SEIFRIT.

II. THE TRIAL COURT ERRONEOUSLY PERMITTED THE STATE TO ELICIT A PURPORTED EXPERT OPINION CONCERNING TIME OF DEATH THAT WAS BASED ON AN ARBITRARY AND UNSCIENTIFIC METHODOLOGY.

III. THE TRIAL COURT'S SUPPLEMENTAL INSTRUCTION IMPROPERLY DILUTED THE REQUIREMENT OF PROOF BEYOND A REASONABLE DOUBT.

IV. THE TRIAL COURT ERRED IN PERMITTING THE STATE TO RELY ON DEFENDANT'S PRE-ARREST SILENCE AS PROOF OF GUILT.

V. THE TRIAL COURT ERRED IN ITS RULINGS CONCERNING THE STATE'S EXTRAORDINARY ACTION IN CAUSING A POLICE CAPTAIN TO ORDER THE DESTRUCTION OF ALL CONTEMPORANEOUS NOTES.

VI. IT WAS ERROR TO ADMIT AUSTIN LETT'S TESTIMONY DESPITE THE DESTRUCTION OF CRUCIAL EVIDENCE OF HIS PREHYPNOTIC RECOLLECTION.

VII. LETT'S TESTIMONY SHOULD HAVE BEEN EXCLUDED BECAUSE THE HYPNOSIS WAS CONDUCTED IN DISREGARD OF HURD.

VIII. THE EXCLUSION OF THE CONTEMPORANEOUS BENCH NOTES DOCUMENTING THE OBSERVATION OF A SPERM WAS ERROR.

IX. THE TRIAL COURT ERRONEOUSLY ADMITTED UNRELIABLE HEARSAY.

X. THE TRIAL COURT ERRED IN FAILING TO CONDUCT AN ADEQUATE INQUIRY INTO EVIDENCE OF EXTRANEOUS INFLUENCE ON THE JURY.

XI. IT WAS ERROR NOT TO INSTRUCT THE JURY THAT NATHAN SEIFRIT WAS UNAVAILABLE.

XII. THE TRIAL COURT ERRONEOUSLY BARRED CROSS-EXAMINATION THAT WOULD HAVE ELICITED EXCULPATORY EVIDENCE.

XIII. THE STATE VIOLATED DEFENDANT'S RIGHT TO AN INFORMED AND UNBIASED GRAND JURY.

After a thorough review of the extensive record, we are satisfied that defendant's conviction should stand. We therefore affirm.

## I.

Defendant John W. Dreher was originally indicted in May 1987 and charged with the purposeful or knowing murder of his wife, *N.J.S.A.* 2C:11–3a(1) and (2); unlawful possession of a knife, *N.J.S.A.* 2C:39–5d; possession of a knife with an unlawful purpose, *N.J.S.A.* 2C:39–4d; and conspiracy to commit murder, *N.J.S.A.* 2C:11–3a and 2C:5–2. He was found guilty by a jury and sentenced to life in prison with a 30–year period of parole ineligibility.

This court then reversed defendant's conviction and remanded for a new trial because of error in admitting hearsay statements made by the murder victim prior to her death and because of the prosecutor's improper reference in summation to hearsay statements made by defendant's son. *See State v. Dreher,* 251 *N.J.Super.* 300, 316–21, 598 *A.*2d 216 (1991), *certif. denied,* 127 *N.J.* 564, 606 *A.*2d 374 (1992) (hereinafter *Dreher I* ). We found that the errors were not harmless. *See ibid.*

On November 4, 1993, a Morris County grand jury returned a superseding indictment, charging defendant with purposeful murder, *N.J.S.A.* 2C:11–3a(1), (count one); knowing murder, *N.J.S.A.* 2C:11–3a(2), (count two); purposeful infliction of serious bodily injury resulting in death, *N.J.S.A.* 2C:11–3a(1), (count three); knowing infliction of serious bodily injury resulting in death, *N.J.S.A.* 2C:11–3a(2), (count four); conspiracy to commit murder, *N.J.S.A.* 2C:11–3a and *N.J.S.A.* 2C:5–2, (count five); and possession of a knife with an unlawful purpose, *N.J.S.A.* 2C:39–4d, (count six).

After many months of pre-trial motions, defendant's second trial commenced on March 1, 1995. The trial continued on various dates until its conclusion with a guilty verdict on all charges on May 10, 1995. Defendant's subsequent motions for a new trial or judgment of acquittal were denied as was his motion to examine the jurors. The sentencing judge merged all of defendant's convictions into the first count of purposeful murder and sentenced defendant to life imprisonment with a thirty-year period of parole ineligibility. Appropriate penalties were also assessed.

On July 28, 1995, defendant filed a timely notice of appeal with this court. He has been denied bail pending appeal.

II.

A.

Defendant met Nance Seifrit in a bar in early 1985 while he was in El Paso, Texas for business reasons; the two began to have an

affair. During 1985, the two kept in touch and met on several occasions. In the fall of 1985, Seifrit moved to Chatham, where defendant lived with his family.

Seifrit, the State's chief witness, who was granted immunity, testified that defendant complained that his wife was a heavy drinker and did not properly care for their two children. Defendant told Seifrit that the two of them would be happy together if he were not married. Beyond this, however, they never discussed marriage, he never asked Seifrit to marry him, and he never discussed divorcing his wife. Other witnesses, who knew defendant's wife, Gail Dreher, confirmed that the marriage had been rocky. Both of defendant's sons, Peter and David, however, testified that their parents were not having any marital problems. The two sons were both in middle school at the time of their mother's murder and were in their early twenties during the second trial. At that time, they both lived at their father's house and worked for the family's leather business.

### B.

According to Seifrit, defendant called her at her mother's house on New Year's Day 1986 to make sure that she would be at her apartment in Chatham the following morning. On January 2, 1986, defendant and Seifrit made plans to confront defendant's wife and tell her about their affair. They arranged for Seifrit to come to defendant's house at about 7:30 a.m., after his sons had left for school.

When Seifrit arrived, she pulled into the driveway and parked her car in the garage as defendant had instructed. Defendant's car was in the back of the driveway, and the garage door was open. Seifrit knocked twice on a door that led from the garage into the house, but there was no answer. Instead, the door swung open by itself, and Seifrit saw the laundry room. She then saw Gail Dreher enter the laundry room, wearing a nightgown. Gail

became upset and asked Seifrit who she was. Seifrit immediately began yelling for defendant.

Defendant came up from behind Gail and hit her with a block of wood. As Gail started to turn, defendant hit her again, on the shoulder. Defendant started to pull Gail by her arm toward the doorway, yelling for her to keep moving. The angrier defendant got, the less Gail argued. They went down the basement steps, with defendant yelling, "just move it, bitch." Gail was saying, "just do what you want, please."

Defendant yelled for Seifrit to come downstairs. She went halfway down the basement stairs, where she was able to see the lower part of Gail's legs. She then went back up and said that she would not come back down. Defendant said that he needed help. He asked Seifrit to bring him something sharp. When Seifrit replied that she did not know what defendant wanted, defendant told her to get something sharp from the kitchen, like a knife or a pair of scissors. Seifrit opened up a kitchen drawer and pulled out a knife. She went back down the stairs and saw Gail tied by her neck to a pole. Gail was in somewhat of a sitting position, but her face was blue. Defendant was kneeling beside his wife, pulling on the rope around her neck. Seifrit tossed the knife to defendant. He picked it up and stabbed Gail in the throat. Seifrit, who was standing at the bottom of the stairs while this happened, then went back upstairs.

Defendant came upstairs, removed the gloves that he had been wearing and put them, as well as the twine that he was holding, on the kitchen table. He then went to a hall closet and handed Seifrit a fur coat. He instructed her to put it in the trunk of her car, which she did. Defendant then told her to take jewelry and other items from the house and make the house look as if it had been robbed. Defendant, in the meantime, was getting dressed for work. Defendant then announced that he had to leave to pick up his father for work. Defendant told Seifrit to go back down to the basement to make sure that "everything was done" and to find everything that was on the pool table.

When Seifrit went downstairs, she saw a metal cobbler's last [1] on the pool table, which she picked up and dropped on Gail's head. She then picked up the knife and stabbed Gail a couple of times. Gail made no movement or noise; her head was hanging down, and Seifrit could not see her face. Seifrit went upstairs with the knife without looking for anything further on the pool table. As she started up the steps, she saw a necklace on the floor, which she picked up. She put the necklace and the knife in the pillowcase, left the house, and returned to her apartment. There, she put the pillowcase in a garbage bag, which she put in the trash cans behind her apartment. The garbage was picked up later that morning. Seifrit claimed that she had been wearing her driving gloves the entire time that she was in defendant's house.

Seifrit then phoned defendant at his office. He told her to calm down and not to worry. He asked her if she had gotten rid of the jewelry, and Seifrit said that she had. Defendant seemed upset that she had picked up the knife. He also asked her about the earrings on the pool table. Seifrit said that she never saw them. Defendant told her that he'd "take care of it" and that he would call her back later. Telephone records confirmed that Seifrit placed this call at 8:49 a.m. and that it lasted for ten minutes. Seifrit spoke to defendant again before she left to go to work at her job at a restaurant. Again, he tried to reassure her. She spoke to him a third time that day when he called her at work. He told her that he intended to return to his home before his sons got home from school.

## C.

For Peter and David Dreher, January 2, 1986, started out as a typical day. They both came downstairs to eat breakfast before school, and they both recall seeing their mother dressed in her pink nightgown. Their father had brought bagels home after

---

[1] A cobbler's last is a wooden or metal form that is shaped like a human foot and over which a shoe is shaped or repaired.

playing squash, and their parents had tried out their new coffee maker. Peter and David left for school at about 7:30 a.m.; Peter left first, and David followed shortly behind. Peter went home with a friend after school that day. David arrived home at his usual time, shortly before 3:00 p.m.

As David walked in through the unlocked garage door, he saw his mother's station wagon in the garage. He called out for her; when he got no answer, he assumed that she was out visiting a neighbor. Defendant came home about ten minutes later. He said that he was home early because he and Gail had a social engagement that evening. Although David never said so at the first trial, at the second trial, he claimed that when his father walked in, he asked where everybody was.

Defendant went upstairs and then came back down and announced, "I think we've been robbed." He called the police from the kitchen. At no point did defendant call out for his wife. After calling the police, defendant went downstairs to the basement. He came up shortly thereafter, hugged David, and said, "Mom's downstairs, I think she's dead." David was in shock. His father called the police a second time from the sunroom. When Peter called from his friend's house, David told him to stay where he was because there had been a break-in.

The Chatham Township Police dispatcher confirmed that he received defendant's first call at 3:32 p.m. reporting a robbery. Two patrol officers were immediately dispatched to the house. Five minutes later, defendant called again, stating, "Can you hurry. I think my wife is dead." An emergency squad and a mobile intensive care unit were notified. The tape recordings of both phone calls were played to the jury. Officers arrived on the scene at 3:39 p.m. The criminal identification division of the sheriff's department, the Morris County prosecutor's office, and the medical examiner were notified within minutes of the officers' arrival on the scene.

## D.

Chatham Police Officer Peter Katsakos, along with his partner Eric Carlson, were among the first to arrive at the crime scene. The officers observed a female victim lying with her back toward the stairs, tied with her hands behind her back with string. The string continued around her neck, and her head and shoulders were suspended from a lally column,[2] about six to ten inches off the carpeted floor. She was wearing a nightgown, which was bunched up around her waist. There was what appeared to be a dried blood stain near the shoulders of the gown, and dried fecal matter was on the victim's bare buttocks and legs.

Katsakos later observed that the victim's face was bloated, purple, and blotchy. About a foot away from the body was a metal cobbler's last. The string used to tie the victim's hands and neck had a lot of haphazard knots in it. The victim had a wound on her scalp and spittle coming out of her mouth. There was a gold bracelet on her left wrist, and, as her body was being removed, Katsakos found a gold heart on the floor beneath her.

Gregory Allman of the Morris County prosecutor's office arrived on the scene at about 4:30 p.m. He confirmed Katsakos' and Carlson's observations. He also explained that the victim's head wounds were not immediately visible from the bottom of the stairs and that it was not until he got closer to the body and examined it that he observed multiple blunt force trauma wounds to the head.

Later that afternoon and evening, the investigators walked through the house to look for obvious signs of disruption. In the den, the officers noticed that all of the drawers of a roll-top desk had been pulled out and that papers on the top were scattered. None of the contents of the drawers had been ransacked. In the living room, the doors to the liquor cabinet had been opened, but the contents were not disturbed. In the dining room, a silver tea service, china, and crystal all appeared undisturbed. In the

---

[2] A lally column is a concrete-filled cylindrical steel column used for structural support.

kitchen, an empty frying pan was on the stove; a pair of soft shoes or slippers were found on the kitchen floor. Katsakos observed a television and videocassette recorder in the sunroom, and Allman observed a fur coat and several purses in the hallway closet.

Upstairs, in the master bedroom, a jewelry box was observed on the floor, with its contents scattered. The doors to the armoire were open and its drawers pulled out, as were the drawers to an end table. The drawers to the table appeared as if they had all been pulled open to the same length. It appeared as if the contents of one of the drawers had been emptied onto a pillow. In the master bathroom, the drawers to the vanity had been pulled out, exposing miscellaneous toiletries; some cleaning supplies had been thrown onto the floor.

Katsakos checked the house for possible points of entry but found none. He also went outside to check for disturbances in the yard or around the exterior of the house. He found no points of entry at any of the doors or windows. That fact was subsequently confirmed by a locksmith who changed defendant's locks the following day.

Ernest Tucker, the chief medical examiner for Morris County at the time of the murder, arrived on the scene at 4:30 p.m. He noted that the victim's head was suspended about six to eight inches off the floor and that her face, lips, and ears were blue, a condition known as cyanosis from the loss of oxygen in the blood. This loss was due to the occlusion of her upper airway, which had been caused by the string passing above her larynx, causing her tongue to block the back of her throat. Blood had soaked into the back and right arm of her nightgown. There was a stab wound to the throat and three gashes to her head which had exposed the bone underneath the scalp. Her body was cold and stiff, and she had defecated.[3] She was not wearing any underwear, and her feet were bare.

---

[3] Tucker would testify that defecation was not an uncommon experience for people in extreme fear.

The nylon string that had been used to tie the victim's head to the lally column was about fifteen inches off the floor. It was tied in an open loop, not a noose, using four separate strands of string. Her hands were tied behind her back but not close together. The skin between the string on her arms was swollen, indicating that she had been alive at the time that she had been bound. The only other sign of struggle in the basement was a broken kite. There was very little blood on the floor. The blood, the fecal material on the victim's buttocks and legs, and the spittle coming from the victim's mouth, were all dried.

The body temperature at 5:30 p.m. was eighty-three degrees. The temperature of the basement was seventy degrees. At 5:40 p.m., Tucker drew vitreous fluid from the victim's left eye to help him determine the time of death. Her body was removed from the basement at 9:00 p.m. so that an autopsy could be performed.

The autopsy revealed that the victim was approximately 5'5" tall and that she weighed between 130 and 150 pounds. She had eight stab wounds in her back, the largest of which was one inch in diameter. Four wounds were on her right side, and she had four wounds on her left side. Tucker described each of the eight wounds in detail for the jury. He explained that some of the wounds were superficial but that two had actually penetrated the victim's lungs. The left lung was partially collapsed. There was not much bleeding associated with any of these wounds, indicating that they were inflicted either at the time of death or after the victim had already died.

Tucker could not say in what sequence the wounds had been inflicted. He estimated that the wounds had been inflicted with a knife, with a tapering blade no wider than one inch. An ordinary kitchen knife was consistent with such wounds. Neither the wounds nor the collapsed lung, however, were the cause of death.

The three wounds to the victim's head were consistent with the metal cobbler's last. The skull was not fractured, there was no injury to the brain, and there was some bleeding, but it was

minimal. He opined that the wounds were probably inflicted at the time of death but were not the cause of death.

Tucker also observed a stab wound in the front of the victim's neck. The wound was associated with a small amount of bleeding, some of it internal. It caused no injury to the victim's larynx and was consistent with a knife wound. Although it was inflicted at the time of death, it was also not the cause of death.

A purplish discoloration on the left side of the victim's neck suggested an attempted manual strangulation, as did a small hemorrhage in the inner surface of the trachea and larynx. In addition, a bruise on the inner front of the victim's right upper arm, overlying the biceps, was consistent with someone having grabbed her with a thumb.[4] Another bruise was found on the front of her right shoulder, just below the collar bone.

With regard to internal injuries, Tucker found a subcapsular hematoma of the liver and a tiny hemorrhage in one of the capillary muscles of the heart's left ventricle, both of which were consistent with a heavy blow being delivered by a knee or fist to the victim's lower chest or upper abdomen. The victim's stomach contents were retrieved and revealed a brownish liquid material consistent with coffee.

Tucker examined the victim's vagina, both internally and externally, and found no signs of injury. No injury was found in either the anal or rectal area. Specimens were taken from all three areas, as well as from her nasal and oral cavities, and preserved for testing. Based on his observations, Tucker concluded that there was no evidence of a sexual assault. He concluded that the victim died of ligature strangulation.

With respect to the time of death, Tucker first noted that such an estimation is not an exact science. In this case, the medical examiner considered such factors as rigor mortis, the stiffening of

---

[4] Two of Gail's friends, Dianne Wells and Jane Peltier Hunt, both testified that defendant was an intense person and that he had a habit, when he spoke to someone, of grabbing their arm and pulling them in close to him.

muscles after death; liver mortis or lividity, the discoloration of the lower surfaces of the body where red blood cells collect after death due to gravity; body temperature, and the concentration of vitreous potassium, the gelatinous fluid in the back of the lens of the eye into which potassium is released following death.

Tucker opined that rigor mortis does not begin until two to five hours after death. Here, the victim had generalized rigor mortis over her entire body. This occurs usually at eight hours after death, give or take two hours. Hence, she had probably been dead for a minimum of six hours. He noted, however, that physical exertion prior to death could cause rigor mortis to settle in more rapidly, as could a warm room.

Tucker noted that liver mortis begins within thirty minutes of death and continues for the next couple of hours. Once lividity becomes fixed, a red or pink area on the skin will not blanche even when pushed. Fixed lividity, which was demonstrated in this case, requires a minimum of six hours. Tucker noted, however, that there was a portion of the lividity that was inconsistent with the position of the body as found. There was lividity along the victim's right leg and buttocks, which suggested that the body may have been moved after death. The time required for lividity to redistribute itself is longer than the time required for it to develop in the first place.

Tucker stated that the victim's potassium concentration level was 7.3 milliequivalents per liter. Using a graph that plotted known potassium concentration levels in people who had died versus the number of hours since their death, Tucker concluded that the victim had died ten hours earlier, give or take four hours. Since her vitreous fluid was drawn at 5:40 p.m., she died sometime between 3:40 a.m. and 11:40 a.m. but probably closer to 7:40 a.m. This conclusion was also consistent with his findings on rigor mortis and lividity. Tucker was careful to note it was a range only and not a precise time.

With regard to body temperature, Tucker noted that the rule of thumb was that a dead body loses one-and-one-half degrees per

hour. Here, the victim lost 15.6 degrees, which meant that she had been dead for a little over ten hours, placing her time of death at 7:30 a.m. The factors affecting this calculation included the amount of clothing on the victim, her body build, and room temperature.

Considering all of the above factors, Tucker concluded within a reasonable degree of medical certainty that the victim had been killed sometime between 7:00 and 8:00 a.m., with a diminishing probability that it was later than 8:00 a.m.

Tucker was vigorously cross-examined about the manner in which he took the specimens from the victim's oral and nasal passages and about the methodology that he used for determining the probable time of death. Tucker admitted that he may have taken a specimen from only the very front of the victim's mouth because her jaw was clenched due to rigor mortis. Edward Poli of the sheriff's office, who was present to photograph the autopsy, verified that the victim had been placed in the body bag in a face-down position and had remained that way for almost one-and-one-half hours prior to the start of the autopsy. Tucker conceded that if any saliva had flowed out of the victim's mouth during the body's transportation to the morgue, it had not been preserved.

Regarding the time of death, Tucker admitted that, as of January 9, 1986, he had estimated the time of death to be 9:00 a.m., give or take four hours. This estimate, however, was before he had done his vitreous potassium calculations. Tucker admitted that if he had done his vitreous potassium calculations differently, using a linear regression instead of a range plucked from two points on the graph, time of death would have been estimated at 10:10 a.m.[5] Tucker also admitted that he had testified before the grand jury in 1993 that time of death was between 7:30 a.m. and 3:30 p.m. Tucker nevertheless maintained that it was his opinion

---

[5] Tucker's additional explanation of the methodology that he used, as well as defendant's cross-examination of the expert on this point, is further addressed *infra* in Section V.

that the victim had been killed in the morning and that it was more likely that she was killed in the early morning. He stated that he was "quite" sure it was the morning, and "reasonably" sure it was the early morning.

## E.

Patricia Kantha Rose, a forensic chemist at the New Jersey State Police laboratory, conducted the examination of the specimens taken from the victim at the time of her autopsy. According to Rose, the victim's oral swabs were negative for seminal material but positive for blood. The swabs were tested for acid phosphatase, an enzyme found in high concentration in semen. The oral smears were placed under the microscope to ascertain the presence of any sperm cells. Both slides were negative. The vaginal swabs and smears were likewise negative for any seminal material or sperm cells, as were the anal swabs and smears. Similarly, the cervical swabs, the vaginal smears, the vaginal washings, the anal washings, and the anal wipe were all negative.

Rose explained that she performed three separate tests on the victim's saliva swabs. She first did a screening for acid phosphatase, which was negative. At a later point in time, she did a P30 test to test for the presence of a certain protein, and she also did a microscopic examination. All three tests produced negative results. The saliva smears were also negative for sperm.

Rose did the same three tests on the nasal swabs that she did on the saliva swabs. All three were negative. On one of the slides for the nasal smears, however, Rose found a single sperm cell. According to Rose, it was a "textbook perfect" sperm cell. It was the proper size for a sperm and it had all the morphological features of a sperm. Nevertheless, because she felt that it was an unusual finding, Rose had two of her supervisors, Burt Heaney and Joselito Versoza, confirm it. They both did. Versoza also testified at trial that the sperm was a "textbook" finding. Rose explained that all it takes to render a sperm result "positive" is the finding of at least one perfect sperm cell.

In Rose's opinion, elicited on cross examination, the presence of even one sperm cell was dispositive for the presence of semen and that there was sexual contact with the victim. Rose also explained how it could happen that sperm was detected in the victim's nose but not in her mouth. According to Rose, the oral and saliva samples could have degraded due to moisture, heat, or bacterial contamination or they might not have been air dried thoroughly enough before they were packaged. She also noted that the oral smears were "thick" when she examined them, rendering it more difficult to detect the presence of sperm. In her opinion, the fact that something was not detected did not mean that it was not deposited. She believed that the finding of one sperm on the nasal slide was significant.

The medical examiner vehemently disagreed with Rose's interpretation of the significance of the single sperm finding. Tucker explained that the typical male ejaculation contains approximately 250 million sperm. Tucker believed that the reported finding of a single sperm in a nasal passage, without any other evidence of sperm, semen, or sexual trauma or injury in or to any other part of the victim's body, was aberrational and should not be taken seriously. He noted that it was very easy to make a mistaken identification because mucous, pollen, and fungus all look like sperm. He pointed out that there was no explanation for what had happened to the other 249,999,999 sperm from the putative ejaculation. He also noted that sperm can be detected for up to three days following intercourse, meaning that the victim could have had sexual contact in the three days prior to her death. He was not sure, however, how long sperm survived in the nose.

Tucker was forced to admit on cross-examination that all that it takes is one sperm to create a human being, that he was not sure how many sperm would ordinarily show up on a nasal smear following oral sex and that he never personally examined the nasal slide in question. He posited that there were other ways, besides oral sex that a single sperm could have ended up on the victim's nasal smear. For example, the victim could have come into

contact with semen on her sons' underwear and then touched her nose.

The crime scene was carefully processed for evidence. Sheriff's Officer Poli explained that he collected various pieces of evidence from the house and that he took fingerprints, palm prints, hair samples, and saliva samples from the victim as well as from the immediate members of defendant's family. He acknowledged that three knives, each with blades of six to seven inches, were sitting in plain view in the kitchen on the countertop. Six additional knives were found in the kitchen drawers, and five more were found in the dishwasher. No string was found in the house that matched the string used to tie up the victim.

Sheriff's Officer Thomas Baxter processed the house for fingerprints. Elimination prints were taken from defendant, members of his family, people who worked in the house, friends, and, at a later time, Nance Seifrit. Baxter lifted many identifiable prints from the house. Although he ultimately did seventy-four examinations for comparison, none of the lifted prints matched anyone other than defendant and his family.

Baxter conceded that one of the two glasses found in the dining room contained the victim's prints along with an "unidentified" print, but he claimed that the unidentified print was of no evidential value. When the print was later submitted to the FBI, it was determined that it did not belong to anyone in the Dreher family or any other known print. Nance Seifrit and her brother Nathan Seifrit were also excluded as possible sources of that print. The FBI also determined that no latent fingerprints of any value could be found on the cobbler's last.

FBI blood and hair experts also testified. They confirmed that blood and hair found on various items at the scene were consistent with the victim's blood and hair.

David Bing, a DNA expert called by the State, testified that he had examined the victim's fingernail scrapings, the victim's dried whole blood stains, and Nance Seifrit's blood stains. According to

Bing, the blood from the victim's fingernail scrapings matched her own blood type, which is found in 1.9% to 4% of the Caucasian population, and excluded Seifrit as a possible source. Bing subsequently performed more detailed DNA testing on the specimens, and concluded that the fingernail scrapings had a combination of genetic types identical to the victim's, that this combination was found in one out of 2,227 Caucasians, and that Seifrit was excluded as a donor.

## F.

After the police were finished collecting and preserving evidence at the scene, defendant was anxious to get back into his house. At about 7:00 p.m. on January 3, 1986, Katsakos and Chatham Police Captain Thomas Ramsey accompanied defendant on a walk through the house so that defendant could give the police a more detailed list of what had been stolen. The first thing that defendant said to Katsakos was that he had heard that the house was a mess and that the police had taken the basement bannister. He was also concerned that the fingerprint powder would irritate his son, who had asthma. An attorney, William O'Connor, also accompanied defendant on his walk-through.

Both officers were struck by the fact that defendant knew that it was the police and not the alleged intruder who had disturbed the condition of the house. For example, defendant first entered the kitchen and noted concern about garbage that he assumed had been left behind by the police officers. Entering the basement, he looked at the spot where his wife's body had been. He then walked to the door that led to his workshop area. The area had a closet off to the side, the door of which was slightly ajar. Defendant remarked, "You must have found the key for this." He then reached above the door frame and retrieved the key. He closed and locked the door.

Defendant then turned to his tacklebox and other items on the workbench and remarked that the police must have moved them because they were normally kept on the shelf. As defendant

walked up the basement stairs, he stopped and said, *"I thought she was hit in the head with the shoe thing but the papers said she was strangled."* (Emphasis added) [6] Ramsey found this comment suspicious because he had given orders not to release information regarding the metal cobbler's last to anyone outside of the investigation. Also, Ramsey testified that the victim's head injuries were not visible upon first entering the basement.

Upstairs in the den, Katsakos asked defendant if he could tell what was missing from the den. Instead of answering, defendant began to straighten things out. He asked about his leather postcards and the keys to his safe deposit box. When he had trouble closing the closet doors, he asked what the police had done to it. Katsakos again asked defendant for the list and told him that he could straighten up later.

In the master bedroom, defendant stated that he would not know if anything was missing from his wife's closet. He then made a comment about things being moved around in his closet and said that nothing was missing. He asked why the bed had been stripped. Although defendant first stated that no jewelry was missing, Katsakos pointed to the jewelry box on the floor. Defendant then identified six items that were missing, including a diamond ring, a gold bracelet, a pair of diamond earrings, a gold and diamond pendant, a pair of gold earrings, and a cocktail ring. Defendant also determined that his wife's beaver coat was missing; however, her mink coat was not. Defendant could not tell if anything was missing from the master bathroom. Katsakos did not see any jewelry in the bathroom. Defendant never supplemented the list of missing items.

The fact that defendant never modified the list of missing items was significant to the State, as the allegedly stolen diamond earrings soon surfaced. On January 4, 1986, the funeral director handling the burial arrangements asked defendant if he had any

---

[6] Ramsey claimed that defendant used the words shoe "last," not shoe "thing," as reported by Katsakos.

jewelry that he wanted to use for the viewing. Defendant said that it had all been taken but that he knew where he could get some. The next morning, defendant brought in a pair of diamond stud earrings, each weighing about one-half to three-quarters of a carat. The earrings were then put on Gail's body for the viewing and returned to defendant after the viewing.

Reagan Callaghan, whose family formerly lived next door to defendant and who had been friends with Gail, came back to Chatham for Gail's funeral. She saw defendant on the afternoon of January 4, 1986. He told her that he wanted her to have a pair of Gail's diamond earrings. At first Callaghan refused, but defendant insisted. Defendant showed them to her and said that he had found them in a dish in the bathroom. About a week after the funeral, defendant gave the earrings to Callaghan.

Wendy O'Connor, another of Gail's friends, also saw defendant on January 4, 1986. He told her that he had given Gail diamond earrings for Christmas but that "they" did not get them. He told her that he had found them on a ledge in the bathroom and that he planned to give them to Callaghan.

On January 5, 1986, Ramsey instructed Carlson to interview defendant again in order to get additional information regarding the stolen property. Defendant told Carlson that he would have to get into his safe deposit box before providing such a list. He never told Carlson that he had found the diamond earrings. Defendant also told Carlson that one of his wife's pocketbooks had been gone through and that her wallet was missing. During this contact with defendant on January 5, 1986, defendant did not ask Carlson about the status of the investigation or the cause of his wife's death.

In the days following the murder, Ramsey had the neighborhood canvassed for leads. He was looking for any information regarding break-ins, suspicious cars, people, or phone calls, or other unusual patterns that might have been noticed by workmen in the area. He also ordered a grid search of the outside grounds. The police followed up on all leads and contacted many people who

surfaced as potentially suspicious individuals. Catch basins were searched for discarded items, a practice common to burglars, and all of defendant's friends, maids, and service people were interviewed. Ramsey claimed that no lead for the murder turned up and that the investigation led nowhere. According to Ramsey's "street" sources, no information regarding Gail Dreher's murder had surfaced.

### G.

Carlson interviewed defendant at his parents' house two hours after the discovery of the murder. Defendant told Carlson that he had left his house that morning at 8:00 a.m. and had picked up his father for work. His sons had left for school at 7:30 a.m. He claimed that Gail did not work and that she did not have plans that day to go out, nor was she expecting any visitors. He did not talk to his wife on the telephone during the day, and he left his office to go home at about 3:00 p.m. When he arrived home, his two dogs were inside the house, and one of the garage doors was open. His wife's car was in the garage.

When he entered the house, he saw that the den was a mess so he assumed that he had been robbed. He went upstairs and saw that the master bedroom was also a mess. He went downstairs to the kitchen where his son David was and called the police. He then went downstairs to the basement to check the liquor cabinet because he assumed that it was kids who had broken in.

According to defendant, as soon as he reached the bottom of the stairs, he saw his wife lying on the floor. He turned around, went upstairs, and called the police from the sunroom. He claimed that he did not go over to his wife's body. Significant to this appeal, discussed hereafter, Carlson testified that defendant never asked him about his wife's cause of death, the status of the investigation, or whether there were any suspects.

Although defendant originally claimed that he had been at his office all day, Carlson noticed a bank deposit slip in defendant's shirt pocket. Defendant then remembered that he had gone to

the bank that morning. The bank deposit slip was stamped at 10:09 a.m. on January 2, 1986, for a bank located on Broad Street in Newark.

At about 7:30 p.m. that evening, defendant approached Ramsey, who was coordinating the investigation at Huron Drive. Defendant asked Ramsey if he could get back into his house to get school books for his sons. Ramsey assured defendant that he would be allowed back in the house as soon as the officers were finished with their work.

Later that evening, at about 9:00 p.m., Police Officer James Condus, acting pursuant to Ramsey's instructions, arrived at defendant's parents' house in order to deliver defendant's two dogs, which had been barking continuously at the back of defendant's house. According to Condus, all of the lights, both inside and outside the house, were off, and no one responded to the doorbell. The officer then knocked on the door, and defendant's father answered, dressed in his night clothes. Defendant then came to the door, dressed only in his pants without a shirt or socks. It appeared to Condus that defendant had been sleeping. Defendant asked him no questions about the investigation.

Still later that evening, Ramsey determined that he wanted defendant reinterviewed while things were still fresh in his mind. Ramsey felt that it was critical to act quickly because there had just been a brutal murder, nobody had been apprehended, and the community was upset. Accordingly, at 11:18 p.m., Carlson called defendant's parents' house and asked to speak to defendant. At first, defendant's mother said that he was sleeping, but defendant then came to the phone. Carlson asked defendant to come to the police station, and defendant agreed to do so. Defendant arrived just past midnight, now January 3, 1986. According to Carlson, defendant was anxious to get back into his house.

During the interview, defendant told Carlson that he had left his house on the morning of January 2 at 5:00 a.m. to play squash at the Chatham Squash Club. His court time was between 5:30 and 6:30 a.m. He then stopped to buy bagels and returned home at

6:45 a.m. He had coffee with his wife and saw his sons leave for school shortly before 7:30 a.m. He left at 8:00 a.m. and picked up his father at 8:05 or 8:10 a.m. Since traffic was light following the holiday, he arrived at work at about 8:35 a.m.

Defendant further told Carlson that he went to a bank, which was near his office, at 10:00 a.m. and that he ate lunch in his office. He left work at 3:00 p.m. because he and his wife had a dinner engagement in New York City at 6:30 or 7:00 p.m. Defendant admitted to Carlson that his marriage was not as smooth as normal. He claimed, however, that there was no possibility of his wife leaving him and that he did not believe that she was having an affair, although he could not be sure. He did not believe that his wife would have answered the door dressed in her nightgown, and he had not seen anything suspicious in the neighborhood that morning. He did say, however, that he had recently been receiving some "hang-up calls."

When confronted with the fact that a neighbor had seen defendant leave his house and return that morning, defendant seemed annoyed and claimed that he never returned to his house. Several more times during the interview, defendant returned to this topic and denied having returned to the house. He was angry that someone would say such a thing, and he wanted the police to bring that person in for questioning.[7]

Defendant gave Carlson the names of some of his wife's friends and the names of people at his office who would have seen him that day. Carlson then noticed that defendant's right hand had nicks on it and that there was a cut on his pinky finger. Defendant claimed he did not know how his hands had gotten like that

---

[7] The neighbor to whom Carlson was referring, who had seen defendant leave and return, was Mary Jeanine Kein. She told police on January 2 that she had seen defendant's car leave his house at about 7:30 a.m. and return ten to fifteen minutes later. She saw defendant's car again at 8:15 a.m., at a traffic light heading out of the neighborhood. Although another neighbor, Austin Lett, also saw defendant leaving his house later that morning, Lett's information did not surface to the police until January 4.

but said it could have happened when he played squash that morning. Defendant's playing partner, Robert Cashel, would later testify that no one suffered any injury that morning and that he did not see defendant injure his hand.

Significant to Carlson was the fact that defendant never inquired about his wife's cause of death, the status of the investigation, or whether the police had any suspects. Ramsey, who was in the station house that night and saw defendant several times, stated that defendant never asked him any of those questions either.

## H.

On January 4, 1986, the police received a call from one of defendant's neighbors, Austin Lett. Lett told the police that he had just read in the newspaper about defendant's claim that he did not see his wife after he left his house at 8:00 a.m. on the day of the murder. Lett was surprised by this claim because he recalled seeing defendant's car pull out of the driveway later that morning. Based on this phone call, the police interviewed Lett at his home later that evening.[8]

According to Lett, who lived two houses away from defendant, on the opposite side of the street, he saw defendant on the morning of January 2, 1986, at approximately 9:15 a.m. On that morning, Lett's wife had left for work at about 8:00 a.m. Shortly before she left, contractors arrived at the Letts' house to install some windows. Although Lett normally left for work at 8:00 a.m., he had decided to ask the contractors to help him remove a

---

[8] Lett was subsequently hypnotized in an effort to enhance his recollection of the details of that morning. Because the hypnosis did not follow the correct procedural guidelines, Lett's enhanced recollection was barred at both the first trial and again at this trial. Both trial courts, however, ruled that Lett could testify regarding his prehypnotic recollection. The ruling of the first trial court was affirmed in *Dreher I, supra,* 251 *N.J.Super.* at 308–15, 598 *A.*2d 216. The ruling of the second trial court is the subject of this appeal. *See* Points IX and X, *infra.*

Christmas tree from within his home to his front yard so that it could be planted.

Shortly after 8:00 a.m., the contractors helped Lett transport the tree by wheelbarrow up his steep driveway to the front yard. Lett then had to cut away the burlap bag from around the tree and plant it in the previously-dug hole. He planted the tree, filled in the hole, and returned the wheelbarrow and tools to the shed behind his house. The entire procedure lasted about thirty minutes.

When he returned to his house, the contractors were concerned about the structural support above the ceiling where the windows were to be installed. Lett then spent some time helping the contractors gain access to a crawl space so that they could inspect the structural support.

Lett then went upstairs to get dressed for work. He showered, shaved, and put on a suit and tie. He went downstairs to talk to the contractors again. As he opened the garage door to leave for work, Lett saw that the contractors had parked their trucks in the bottom of his driveway and were blocking his exit route. Instead of asking the contractors to move the trucks, Lett decided to maneuver around the trucks by backing up his driveway to the street.

As Lett reached the top of his driveway, he saw defendant's car to his left, coming down defendant's driveway "nose first." Because Lett was leaving so late for work, he did not want defendant to see him. Lett explained that this was because the neighborhood had a certain work ethic and because he was an alcoholic at the time and did not want defendant to assume that he had been drinking.[9] To avoid being seen, Lett accelerated his car and scooted down in his seat. He then proceeded to work.

---

[9] Lett explained, in somewhat excruciating detail, the circumstances and patterns of his alcoholism, which began in 1957 when he was sixteen years old and which continued until just two months after the murder, in March 1986, when his wife staged an intervention resulting in in-patient rehabilitation treat-

Lett did not notice defendant's car in his rearview mirror when he stopped at a corner several blocks away. Defendant's car was a green Oldsmobile Tornado that was similar to a Cadillac Eldorado that Lett had once owned. Lett had seen defendant driving that car many times. Although defendant's car had a distinctive license plate, "LEDER," the German word for leather, Lett did not recall seeing it that day.

Lett estimated that it took him ten minutes to drive to work and that he arrived at about 9:30 a.m. Based on his travel time and the time spent with the contractors, he determined that he had seen defendant's car at about 9:15 a.m. He acknowledged, however, that he had previously testified that he had seen defendant's car as late as 9:30 or 9:35 a.m. He claimed that his time range was an estimate and that 9:15 was the most "conservative" estimate in the range.

Gary Sager, one of the contractors who worked on Lett's house that morning, verified that he arrived at about 8:00 a.m. that morning and that he helped Lett move his tree. He also verified that Lett had to provide him access to the crawl space and that they spent some time talking. Sager estimated that he spent "at least an hour and a half, maybe longer" with Lett before Lett left. Although Sager claimed that this was the minimum amount of time that he spent with Lett, he conceded that he had previously testified that he arrived at 7:45 a.m. and spent "at least a good hour, hour and a half easily" before Lett left.

## I.

Seifrit continued to see defendant after the murder. He went to her apartment between two of the viewings of his wife's body.

---

ment in Minnesota. As of the time of the second trial, Lett had not had a drink in nine years. He claimed that, as of January 1986, he was a "maintenance drinker," who drank about one-half to three-quarters of a quart per day but only in the afternoons or evenings and only when his wife was not around to see him. He was extensively cross-examined on this issue at trial.

He told her that he had been questioned by the police but that they did not know about her. When he asked her about the jewelry and fur, she realized that the fur coat was still in her trunk. She later put it in a garbage bag and dumped it outside the restaurant where she worked.

Seifrit continued to have sexual relations with defendant throughout the month of January 1986. After the murder, she no longer called him; rather, he would call her, usually from pay phones, because he was afraid that the police were checking his telephone lines.

In February 1986, defendant asked her if she would come to his house and cook for him and his sons. They first planned an "accidental" meeting at the grocery store so that defendant could introduce her to his sons as somebody that he knew from the restaurant where defendant and his family used to dine. Shortly after that meeting, she came over to cook dinner for them. As she pulled onto defendant's street that night, she saw a car watching defendant's house.

The following Sunday, Seifrit came over to defendant's house to eat take-out Chinese food with defendant and his sons. On her way home, she was stopped by the police. Investigators from the prosecutor's office confirmed that defendant's house had been under surveillance and that, on February 21 and 23, 1986, Seifrit's car was seen there.

Once Seifrit's identity became known, she became a target for questioning. On February 28, 1986, Allman showed up at her place of work to interview her. Although Seifrit was asked about her relationship with defendant, she maintained that it was platonic. Seifrit was also interviewed on May 27 and May 29, 1986. She advised defendant of each interview. After her first interview, defendant told Seifrit "not to worry." After Seifrit's third interview, defendant gave Seifrit the name and number of an attorney to call. This attorney told Seifrit not to speak to the prosecutor's office unless she was subpoenaed. On June 2, 1986, Seifrit was

subpoenaed to appear before a grand jury but the appearance was postponed.

Although Seifrit still maintained that her relationship with defendant was platonic and that she knew nothing about defendant's marriage or about Gail's death, she claimed at trial that she and defendant had rehearsed exactly what she should say to the investigators. Seifrit and defendant continued to socialize during the summer of 1986 and began to be seen together in public and with friends.

Meanwhile, Allman's continuing investigation of Seifrit revealed that she had used various dates of birth and social security numbers. Also, there were discrepancies in many of the facts surrounding her personal history.

On August 25, 1986, Seifrit was arrested as a material witness. On the date of her arrest, she was living in Maplewood and stated that her height and weight were 5'11" and 150 pounds, respectively. She posted bail and was released. Despite her arrest, defendant still told her not to worry because the police did not have anything, and defendant had friends in the prosecutor's office.

Seifrit appeared before a grand jury in October 1986 at which time she was represented by an attorney, paid for by defendant. She pled the Fifth Amendment. Although the prosecutor's office knew that she was an untrustworthy witness, they did not know that Seifrit had had any involvement in the murder. Hence, on December 23, 1986, a decision was made to grant Seifrit immunity.

Although defendant still urged Seifrit not to say anything, she insisted that she had to say something now that she had immunity. Thus, when Seifrit testified before the grand jury on December 30, 1996, she admitted that she was at the house and that she had participated in the staged burglary, but she denied having anything to do with the murder itself. Shortly afterwards, she retained the services of a different attorney.

On January 20 and 27, 1987, Seifrit again testified before the grand jury. She admitted that she went down to the basement

when defendant called out to her and that she went back to the basement after defendant left in order to retrieve the knife. She did not testify that she had stabbed or hit the victim. On February 3, 1987, Seifrit again testified before the grand jury. This time, she admitted that she gave defendant the knife and that when she went back down to the basement she hit and stabbed the victim.[10]

Seifrit moved to North Carolina in 1987, and her last conversation with defendant occurred in April or May 1987, after defendant learned what Seifrit had said to the grand jury. While Seifrit was in North Carolina, she had difficulty getting defendant to return her telephone calls. She claimed that her life was very miserable because she had been forced to testify, that she became angry when defendant refused to call her, and that she did not know if she would be alive or dead to testify. The defense played for the jury a tape recording of a message that Seifrit had left on defendant's answering machine, apparently threatening to make defendant's life as miserable as hers. Defendant was indicted in May 1987.

## J.

Wendy O'Connor testified that when she saw defendant in early 1987, he told her that both his boys liked Seifrit and that Gail had not known about her. He also told O'Connor that he knew that Gail was having an affair with someone, possibly more than one person.

Jane Peltier Hunt, another of Gail's friends, also saw defendant after the murder. He offered her some of Gail's clothes, but she refused the offer. He indicated that he was planning on staying in the house and wanted to show her the things that he had done to it. When Hunt, a single parent herself, suggested that defendant

---

10 Allman admitted that Seifrit's admission came as a surprise to the prosecutor's office, because they had not believed her to be a participant, and that, to a certain extent, she had misled his office.

had had a tough time, defendant responded that a divorce would have been easier.

Al Jeffers, an employee of Dreher Leather, was interviewed by Allman and Katsakos. He recalled speaking to defendant by phone on the day of the murder, although it was disputed whether he spoke to defendant by phone at 9:05 or 9:15 a.m. Jeffers recalled that he also saw defendant at 11:30 a.m. at which time Jeffers test-drove defendant's car in anticipation of buying it from him.

The State also verified that Andrew Reilly, the automobile dealer from whom defendant was buying his new car, had called defendant's office that morning, at 9:05 a.m., to get automobile insurance information in anticipation of delivering the car to him. Reilly asked the receptionist for defendant but did not speak to him at that time. Instead, Reilly got the information that he needed from someone else at the company. Defendant returned Reilly's call later that morning, at about 11:00 a.m. Still later that day, at about 1:00 p.m., Reilly called defendant back to tell him that his car was ready for delivery. Defendant, however, did not make arrangements to pick up the car that day and did not mention any dinner engagement that he had in New York. Defendant instead picked up the car on January 10, 1986.[11]

A dry cleaning delivery man testified that when he got to defendant's home that afternoon, at about 2:00 p.m., the dogs were inside defendant's house.

### III.

Defendant did not testify in his own behalf and offered only two witnesses. In addition to a general challenge to the State's having met its burden of proof beyond a reasonable doubt, his defense

---

[11] While he was at the car dealership that day, defendant asked Reilly if he could use his phone. The State obtained by phone records that showed that defendant called Seifrit for one minute at 4:21 p.m. and again for twenty-one minutes at 4:28 p.m. Both calls were placed from Reilly's office.

consisted of: (a) an attack upon Seifrit's credibility; (b) proof to suggest that Seifrit committed the crime with a male other than defendant, possibly her brother Nathan; and (c) an alibi for a portion of the day in question.

## A.

The defense portrayed Seifrit as a person who had lied on numerous occasions in her past, who had led a life filled with deception, and who had been out to capture herself a rich husband. In addition, the defense was able to suggest that her trial testimony was not worthy of belief because it was inconsistent with her prior testimony. The defense was able to point out inconsistencies not only between her trial testimony and her 1986–1987 grand jury appearances but also between her first and second trial testimony and between her trial testimony and her most recent grand jury appearance in October 1993. Finally, the defense suggested to the jury that Seifrit's relationship with the prosecution was a "cozy" one and that her testimony had been achieved at a very high cost, her immunity from prosecution. In all, Seifrit testified for six days. On Seifrit's general credibility, the evidence showed that she had used different versions and spellings of her name, different dates of birth, and different social security numbers on numerous occasions to evade her creditors. She also may have been trying to avoid law enforcement because she had bounced checks and did not have proper motor vehicle paperwork. In addition, there was evidence that she had told lies about her ability to fly a plane, the level of her formal education, where she had attended school, and her reasons for leaving prior jobs. These deceits were usually part of an effort to obtain employment. Seifrit admitted that she often lied to serve her own interests and that she had told so many lies about herself that it was hard to keep track of the truth.

Seifrit also admitted: that she owned a registered gun; that she had told Allman that she had once shot a man in Miami, but that this was false; that after she moved to North Carolina, she told a

diet doctor that she weighed 186 pounds and needed to lose weight for a job; [12] that, at the time of the murder, she had a close male friend, a former boyfriend, who was married, living in Ohio, and with whom she talked by phone; and that in North Carolina she had lived for an extended period of time with a man who raced cars.

When questioned about her love for defendant, Seifrit claimed that she continued to love him up until the conclusion of her cross-examination at the prior trial and that there was a part of her that could still love him. She denied that she fell in love with him for his money. Although she would have married him, it was a moot issue because he was already married.

Seifrit also admitted that she did not throw the diamond ring that she had taken from defendant's house into the dumpster but that she instead wore it to work as an engagement ring to keep other men from hounding her. She claimed that defendant had told her to keep it but that when the police started asking questions about it and when defendant asked for it back, she threw it out of her car window while driving through West Orange. She denied selling it.

With regard to inconsistencies in her testimony, Seifrit admitted that she was not completely forthright in her first three grand jury appearances. She maintained, however, that it was only her involvement, and not defendant's, that she had lied about. She also admitted to numerous inconsistencies in the details of the murder, including where she had parked that day, whether the garage door was up or down, whether she had thrown up or washed her face while in defendant's house, the manner and number of times that she had assaulted the victim, and whether defendant had asked her about the earrings during their 8:49 a.m. phone conversation.

---

[12] Apparently, the suggestion here was that Seifrit weighed considerably more than the victim at the time of the murder but was trying to minimize this difference.

She also admitted that it was not until her most recent appearance before the grand jury that she admitted that the victim saw her when she walked in the house on the morning of the murder. Seifrit believed that it took her a long time to come to terms with the fact that she had actually seen a woman face-to-face prior to taking part in her murder. Also, Seifrit had been ashamed that she had had the opportunity to turn around and walk away but had chosen not to.

With respect to her relationship with the prosecution, Seifrit admitted that, despite her numerous lies, including ones that she told under oath while testifying in court, she had never been prosecuted for anything, not even perjury. Also, she admitted that she had tried to solicit Allman's help in getting her out of a problem with a bounced check.

The defense also used its cross-examination of Seifrit to suggest that her brother, Nathan Seifrit, might have helped her commit the murder. Implicit in this suggestion was that Nathan had forced the victim to have oral sex, thereby explaining the sperm in her nasal passage. Seifrit, however, claimed that she did not know where her brother was living or working in 1985 and 1986, that she did not speak to him very often, that they saw each other only occasionally, and that, at the time of trial, she had not seen him in years. She further claimed that he had never visited her in New Jersey and that, prior to the murder, the last time she had corresponded with him was in 1983, when she was living in Florida.

Although Seifrit recalled seeing Nathan one Christmas at her mother's house in Pennsylvania, she was not sure whether it was the Christmas of 1985. She was sure, however, that she did not see him around New Year's day in 1986. She later found out in 1989, that he had been working at Great Adventure in New Jersey in January 1986.

On cross-examination the defense elicited Seifrit's testimony that in the fall of 1986, Nathan helped Seifrit move their mother to Hilton Head, South Carolina; Nathan then moved there himself.

Seifrit recalled that, between 1986 and 1989, she saw him at Christmas in Hilton Head while she was visiting her mother. Nathan moved away from Hilton Head a short time after Seifrit moved to Hilton Head, sometime in 1989 or 1990. The last time that she spoke with him was the day their mother died. He called the hospital to speak to their mother, and Seifrit did not even recognize his voice on the phone. After her mother's death, Seifrit learned that Nathan was in Arizona but she had no direct contact with him at all. As of the second trial, she did not know his whereabouts.

Although Allman had interviewed Nathan in Arizona some time prior to the second trial, and although the defense had succeeded in getting the court to order Nathan's appearance at trial as a necessary and material witness, Nathan was never produced at trial by either the State or the defense. The State advised the court that it did not know his current whereabouts. The court refused the defense request to instruct the jury that Nathan was "unavailable" to testify.[13]

### B.

Defendant presented the testimony of Dr. Robert White, the urologist who performed a vasectomy on defendant on July 1, 1974. White explained that such a procedure prevents the ejaculation of sperm. He also testified that on August 20, 1974, he tested defendant's semen and found no sperm present. Four months later, on December 21, 1974, a similar analysis again revealed the absence of any sperm in defendant's semen. White concluded that the surgery had been successful and that defendant's future ejaculations would not contain any sperm.

On cross-examination, White admitted that spontaneous recantilization sometimes occurs, whereby a connection is reestablished between the lower and upper parts of the tube that carries sperm

---

[13] Defendant alleges in this appeal that this was error. This issue is discussed *infra* in Part XIV.

from the testicle to the prostate. White claimed that this is rare and that when it does happen, it usually occurs a short time after the vasectomy itself. White also admitted that the vasectomy procedure may be surgically reversed and that he had not examined defendant since 1974.

On redirect, White explained that a successful reversal becomes less and less likely as the years pass, that he had never seen a spontaneous reversal occur later than six months after the vasectomy, that sperm have a fairly short life span and will die within a few months and become absorbed by the bloodstream, and that an analysis of defendant's semen done in 1993 again revealed the absence of any sperm.

### C.

Defendant called as his second witness, his neighbor, Mary Kein, who testified that, on the morning of the murder, from the vantage point of her kitchen window, she saw defendant's car leave at about 7:30 a.m. It returned ten to fifteen minutes later. She did not see who was in the car. She saw defendant's car again later that morning at about 8:15 a.m., waiting for a traffic light at an intersection not far from Huron Drive. She admitted that her times were approximations.

### D.

Through cross-examination of other witnesses, the defense suggested that the murder may have occurred later in the morning than the State contended at a time when defendant was at his office. For example, it was suggested that the frying pan found on the stove indicated that Gail had had time to cook something after everyone had left the house that morning. David claimed that a laundry basket with clean laundry in it, found by the police on his bed in the afternoon, had not been there when he left for school that morning, indicating that his mother had had time to fold laundry before she was murdered.

Additionally, although Seifrit claimed that she left for her job at about 10:00 a.m., phone records showed that a call was made from her place of employment to the business located on the ground floor of her apartment at 10:40 a.m., suggesting that her employer may have been looking for her at that time. The medical examiner was cross-examined at length regarding the exact time of the murder, with the defense suggesting that it occurred closer to ten or eleven o'clock rather than 7:30 as maintained by the expert.

The State had taken the position that defendant got to work that morning at his regular time but then left after his 8:49 a.m. phone call with Seifrit had concluded at 8:59 a.m. This would have given him enough time to go home, get his wife's earrings, bring the barking dogs inside, and make sure that his wife was dead before returning to Newark, where he was seen at 10:09 a.m. at the bank on Broad Street. The only witness who saw defendant's car at home during this time frame was Austin Lett.

After deliberating for two full days, the jury returned a verdict finding defendant guilty of the knowing and purposeful murder of his wife.

### IV.

Defendant contends that the court erred in restricting his cross-examination of Nance Seifrit "about matters of vital importance to her credibility and her motive to commit the murder." We disagree.

### A.

Defendant first contends that the judge erred by precluding him from cross-examining Seifrit about her recent credit card fraud, which had occurred while she lived in Baltimore in 1990 and 1991. This fraud complaint resulted in a disposition prior to judgment in the Maryland courts. Defendant contends that because the State had gone to great lengths to portray Seifrit as a reformed sinner who had cleaned up her act by the time of the second trial, the

jury should have been informed of this most recent escapade in order to assess properly the accuracy of the State's portrayal.

It was represented to the judge that Seifrit had forged a credit card application in order to get a credit card in someone else's name. It was further represented that Seifrit used the card to get cash advances. No judgment of conviction was ever entered against her in Maryland for this offense. Seifrit was indicted, admitted her wrongdoing, and requested probation and community service. The disposition, known in Maryland as a "probation before judgment," was apparently similar to the pretrial intervention program in New Jersey.

The defense argued that the evidence was admissible as a prior bad act, stealing, which was similar to the bad act in the present case, burglary, to show Seifrit's motive and her willingness to engage in criminal conduct to obtain things of value. The defense also urged that the evidence was admissible to impeach Seifrit's credibility.

The judge ruled that, without a judgment of conviction or *nolo contendere* plea, the evidence was inadmissible to impeach credibility because pretrial diversion, even accompanied by an admission, is not the same as a conviction. Further, because Seifrit's fraudulent conduct did not bear a sufficient nexus to the matters being tried, it could not be used as evidence of a prior bad act. Defendant was allowed, however, to tell the jury that in 1990, while she was living in Baltimore, Seifrit had used a social security number, different from her own, to obtain a credit card.

Defendant claims that this limited use of the matter was insufficient and that the true nature of the fraud could only have been revealed by introducing the criminal disposition. We disagree.

Defendant contends that when one party puts in issue the character or state of mind of a witness, the opposing party is entitled to present evidence on the same subject even though it might otherwise be barred by the rules of evidence. Here,

according to defendant, the State opened the door by seeking to show that Seifrit had reformed her ways.

Defendant contends that the evidence was admissible under *N.J.R.E.* 404(b), which allows evidence of "other crimes, wrongs, or acts" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." Such evidence, however, is not admissible to prove the disposition of a person in order to show that he or she acted in conformity therewith. *See ibid.* According to *N.J.R.E.* 404(a)(3), evidence of a witness' character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion except as provided in *N.J.R.E.* 608. According to *N.J.R.E.* 608:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness, and provided further that evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. *Except as otherwise provided by Rule 609, a trait of character cannot be proved by specific instances of conduct.*
>
> [*Ibid.* (emphasis added).]

*N.J.R.E.* 609, in turn, allows a witness's credibility to be impeached by the conviction of a crime. Defendant makes no argument on appeal that the Maryland disposition was a criminal conviction.

 Specific instances of a witness's conduct, then, relevant only as they may tend to prove a trait of character, may not be used to affect the credibility of a witness. *See State v. Hutchins,* 241 *N.J.Super.* 353, 361, 575 *A.*2d 35 (App.Div.1990); *State v. Schlanger,* 197 *N.J.Super.* 548, 551–52, 485 *A.*2d 354 (Law Div. 1984). If specific instances of conduct are offered for another articulable reason, they may be admitted unless excluded under another rule. *See State v. Coruzzi,* 189 *N.J.Super.* 273, 305–06, 460 *A.*2d 120 (App.Div.), *certif. denied,* 94 *N.J.* 531, 468 *A.*2d 185 (1983). Here, defendant offered the evidence of the criminal

disposition to refute the State's claim that Seifrit was a reformed woman.

Refuting the State's claim that Seifrit was a reformed woman is just another way of showing that Seifrit had not reformed or that her character was bad. Proving a trait of character, by any other name, is still not permissible under our rules of evidence. Additionally, after reviewing the record, we conclude that defendant has greatly overstated the State's position with regard to Seifrit's "reformation."

While it is true that the State introduced general background information about Seifrit that showed that for several years prior to the second trial, she had been living and working in Baltimore and that she was currently an administrator for a bank's loan department. It is also true that in summation, the State referred to those facts and that it rhetorically asked whether Seifrit, at age thirty-seven, was finally "growing up." The State, however, also admitted that Seifrit had lied in the past to advance her own interests, and it referred to her as a "survivor."

Evidence of Seifrit's prior lies and deception, such as the use of aliases, false social security numbers, false dates of birth, false job references, inflated years of completed education, evasion of bankruptcy laws, and evasion of bad debts, was the centerpiece of the defense. Rather than try to show that Seifrit had not lied or deceived others in the past, the State made the argument that the jury should consider her for what she was—a bad liar who told lies that often made no sense but that hurt no one. The State asked for no sympathy for Seifrit and urged the jury not to let defendant go free just because the prosecution had let Seifrit go free for her part in the murder. The prosecutor also pointed out that the State had not "picked" Seifrit. It was defendant, according to the State, who "picked" Seifrit when he chose to cultivate a relationship with her.

■ Defendant correctly points out that "other crimes" evidence about a State's witness is often admitted when offered by

criminal defendants for exculpatory reasons. *See, e.g., State v. Gookins,* 135 *N.J.* 42, 47, 637 *A.*2d 1255 (1994) ("other crimes" evidence used to suggest that the State's witness had an opportunity to tamper with evidence or that the evidence was not the result of mistake or accident); *State v. Garfole,* 76 *N.J.* 445, 453, 388 *A.*2d 587 (1978) ("other crimes" evidence used to show that it is more likely than not that someone other than the defendant committed the crime in question). When a criminal defendant seeks to offer such exculpatory "other crimes" evidence, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice. This is because an accused is entitled to advance in his own defense any evidence that may rationally tend to refute his guilt or buttress his innocence. *See id.* at 453–57, 388 *A.*2d 587; *State v. Bull,* 268 *N.J.Super.* 504, 511, 634 *A.*2d 101 (App.Div.1993), *certif. denied,* 135 *N.J.* 304, 639 *A.*2d 303 (1994); *State v. Williams,* 214 *N.J.Super.* 12, 20–21, 518 *A.*2d 234 (App.Div.1986).

Clearly, defendant did not want to introduce the "other crimes" evidence about Seifrit for this reason. Instead, defendant wanted the jury to know about Seifrit's 1990 entanglement with the law to suggest that Seifrit was the type of person who would do anything for money, not to exculpate defendant. This is precisely the type of proof of disposition that *N.J.R.E.* 404(b) expressly prohibits. Proving that Seifrit was greedy and predisposed to criminal conduct would not have made it any less likely that defendant murdered his wife. *Cf. State v. Sease,* 138 *N.J.Super.* 80, 83–84, 350 *A.*2d 262 (App.Div.1975) (noting that the fact that someone else admitted committing a crime that was perpetrated by more than one person in no way exculpates the defendant since he or she could have also participated).

The exclusion of this evidence was not error. Such evidence would have been collateral and irrelevant. *See State v. Schlanger, supra,* 197 *N.J.Super.* at 554, 485 *A.*2d 354 (refusing to allow the impeachment of a State's witness with misconduct related to the

filing of his tax returns where such impeachment was calculated to degrade the testimony of the witness over matters not in issue).

## B.

Defendant also contends that the judge erred in precluding the defense from reading into evidence a statement about Seifrit contained in a brief, written by the State, that was submitted in connection with a pretrial motion in 1993. Defendant sought to compel Seifrit to submit to a psychiatric evaluation. The State's brief in opposition stated:

> Trial courts and juries, without aid of expert testimony, evaluate witnesses like Nance Seifrit every day. Nance Seifrit is a petty thief and liar who has admitted that she has lied whenever it has been to her advantage to do so. The defendant has not shown her to be so feebleminded or mentally deranged that the credibility of her testimony cannot be adequately determined by a jury.

The judge denied defendant's request to take judicial notice of this statement, ruling that it was a statement contained within a party's brief as opposed to one contained within a certification or affidavit.

On appeal, defendant urges that this statement constituted an admission of a party opponent.[14] He claims that the statement was significant because it constitutes an admission, in 1993, that Seifrit "is" not "was" a liar, suggesting that she had not yet reformed.

We cannot conceive that the judge's refusal to take judicial notice of this pleading was error. Although counsel's brief was phrased in the present tense, in context, that was 1993. A statement in 1993 does not permit an inference that Seifrit would lie, or did lie, on the witness stand in 1995. We find that, in the context of this protracted trial, the statement was properly excluded under *N.J.R.E.* 403, as its probative value was substantially

---

14 There is authority for the proposition that pleadings may be used as evidentiary admissions against a party and that a client is bound by the pleadings filed by counsel. *See State v. Irving,* 114 *N.J.* 427, 437, 555 A.2d 575 (1989); *see generally,* 2 *McCormick on Evidence* § 257 at 147–151 (4th ed.1992).

outweighed by the risk of misleading the jury or the risk of needless presentation of cumulative evidence.

## C.

■ Defendant next contends that the judge erroneously barred him from showing that Seifrit owed more than $6,000 to American Express in the months prior to the murder and that when she filed for bankruptcy in 1987 her debts totalled more than $31,000. According to defendant, such a large debt provided Seifrit with the motive to murder defendant's wife so that she could marry defendant and share in his wealth. Given the evidence that the jury heard regarding Seifrit's personal and financial background, any error in the exclusion of this one piece of testimony was clearly harmless.

The State sought to preclude cross-examination of Seifrit on the issue of unpaid charges that she owed to American Express in 1985. The State argued that this was another instance of a prior bad act being used to impeach credibility. The judge granted the State's request and barred any questions regarding Seifrit's outstanding debts or balances but noted that any fraudulent misrepresentations that Seifrit may have made, either in obtaining the card or in escaping liability, would be admissible.

The judge ruled, for example, that because Seifrit had submitted an incorrect social security number on her bankruptcy petition in federal court, that misrepresentation would be admissible. The petition itself, the list of unpaid creditors, and the amounts discharged in bankruptcy were not admitted. The judge refused to allow evidence of the witness's poverty to be used as proof of her motive to commit a crime for financial gain. The bankruptcy petition had listed approximately twenty different creditors with a total debt of more than $31,000.

On cross-examination, defense counsel elicited from Seifrit that, when she and defendant were taking plane trips to various places to meet each other in 1985, she would charge her travel expenses to American Express and then pocket the money that defendant

gave her for reimbursement. That is, she admitted that she left American Express holding the bill. She also admitted that she had used a false social security number to obtain that credit card.

Seifrit further admitted that when she moved to Chatham in the fall of 1985, she worked two jobs in order to make ends meet and that she still had outstanding loans in the amount of approximately $3,000 from when she had lived in Pennsylvania. She admitted that she had used false social security numbers so that she could avoid paying back those loans.

The defense further elicited from Seifrit that she had been discharged from her job at Eastern Airlines; that she had bounced a $2,800 check while she was the part owner of a bagel franchise; and that she had bounced another check while purchasing a dress. She claimed that despite her "difficult financial circumstances," she was not dating defendant because of his money.

The defense then broached the subject of Seifrit's bankruptcy. She admitted that she had used a false social security number to file the petition, that she had filed it because of her financial circumstances, that she had signed the petition under penalty of perjury, and that she had thus committed perjury in federal court. The defense then renewed its request to have the amount of Seifrit's American Express debt presented to the jury, arguing that her financial condition was relevant to her motive. The State objected on the ground that the precise amount of the debt was irrelevant since she had already admitted to owing money and not paying it back. Also, the State objected to the inference that because Seifrit did not have a lot of money, she had the motive to have a relationship with defendant.

The judge ruled that Seifrit's inability or unwillingness to pay her American Express debt, together with her Pennsylvania loans, was already before the jury and that nothing would be served by presenting the specific amounts that she owed. Such specific instances of conduct did not necessarily go to her motive. Whether Seifrit owed "$4,000 or $3,000 or $8,000 or $9,000" was a matter

over which there could be disagreement and which would only serve to muddle the issues.

We agree. While it is true that Seifrit's financial circumstances could have provided her with a motive for dating defendant and even a motive for helping him to kill his wife, it does not necessarily follow that proof of her impecuniosity made it more likely than not that she committed the murder *without* defendant. *See State v. Martini*, 131 *N.J.* 176, 266, 619 *A.2d* 1208 (1993), *cert. denied*, —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.2d* 137 (1995); *State v. Mathis*, 47 *N.J.* 455, 471–72, 221 *A.2d* 529 (1966). *Cf. State v. Vigilante*, 257 *N.J.Super.* 296, 307, 608 *A.2d* 425 (App.Div.1992) (holding that evidence of defendant's gambling debts was relevant to prove animosity between him and victim and to show his need for money).

Moreover, Seifrit's financial circumstances were before the jury in excruciating detail. There is no possibility that any juror could have harbored the belief that Seifrit was a woman of independent means who liked to pay her own way. On the contrary, the proofs were overwhelming that she enjoyed having things of monetary value even though she could not afford them and that she lived above her means, usually by defrauding her creditors or by using someone else's money. The precise amount of Seifrit's American Express debt would have added nothing to the case and would have only caused "undue delay, waste of time, or needless presentation of cumulative evidence." *N.J.R.E.* 403.

## V.

In his second point, defendant contends that the judge erred by allowing the medical examiner to testify regarding the estimated time of death based on the decedent's vitreous potassium level because the witness's methodology was not generally accepted in the scientific community. We disagree.

As noted, *supra*, in Part I–D, the victim's vitreous potassium level had been read at 5:40 p.m. Based in part on that level,

Tucker estimated that the victim had died ten hours earlier, plus or minus four hours. Tucker arrived at this estimate by using a graph prepared by a scientist named John I. Coe, M.D. The graph was widely accepted and distributed to all medical examiners in the United States by the Department of Justice Law Enforcement Assistance Administration. On this graph, the vertical coordinates represented the known potassium levels for more than 100 people who had died, and the horizontal coordinates represented the number of hours since their death.

According to Tucker, although the underlying assumption of the graph was that the distribution was a linear regression, the plotting of coordinates did not actually result in a straight line. That is, Tucker believed that the graph could be interpreted as having two lines or as being a curve. Hence, Tucker viewed the graph as representing a "range" of acceptable figures. Accordingly, he drew a line from 7.3, the victim's potassium level at 5:40 p.m., to find the earliest and the latest hours from death that were depicted on the graph for that level. Since the earliest was six hours and the latest was fourteen hours, Tucker chose the midpoint, ten hours, plus or minus four hours.

Tucker admitted that he did not take a weighted average and that he did not know how many coordinates were plotted between six and fourteen hours. Although he thought there were some scientists who had probably used his method, he could not name any offhand. He also admitted that, using Coe's linear regression method, the estimated time of death would have been later in the morning than Tucker's estimate. Tucker stated, however, that he and Coe disagreed in this area. In any event, both his method and Coe's resulted in a range of hours. That is, even Coe's estimate of seven hours had to be plus or minus something.

Defendant had moved to bar this anticipated testimony prior to trial. In support of his motion, he presented a certification from Coe. Coe stated that to use his graph properly, a person must establish a horizontal line from the point on the vertical axis that reflects the decedent's known potassium level and establish a

vertical line from the point of intersection between the horizontal line and the line of least squares. The intersection between the vertical line and the horizontal axis would represent the midpoint of the established postmortem interval.

It was Coe's further opinion that the method that Tucker used was not sound, reliable, or accurate and that it lacked the necessary scientific basis to produce uniform and reasonably reliable results.[15] Coe also opined that Tucker's method did not contribute materially to the ascertainment of the truth, was not generally accepted by experts in forensic pathology or in the authoritative literature, was likely to result in statistically aberrational findings, and was a distortion of scientific and statistical principles.

The State opposed the motion to bar Tucker's testimony, arguing that Coe was not the owner or developer of the method used to determine the time of death from potassium levels; rather, Coe had merely plotted data on a graph. The method for using the data was subject to legitimate debate, especially where Tucker had decided to modify Coe's methodology by incorporating other considerations based on his knowledge of the murder scene. Defendant responded that the State had not produced anyone who could refute Coe's certification or support Tucker's approach.

The judge denied the motion, ruling that whether Tucker had properly conducted the vitreous potassium test, in conjunction with other tests, to determine the time of death was a fact question for the jury because there was room for legitimate disagreement. We agree.

A.

The results of scientific tests are admissible at trial when they are shown to have a "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materi-

---

[15] Coe was anticipating Tucker's testimony based on the forensic evidence used in the first trial.

ally to the ascertainment of the truth." *State v. Hurd,* 86 *N.J.* 525, 536, 432 *A.*2d 86 (1981); *see also Windmere, Inc. v. International Ins. Co.,* 105 *N.J.* 373, 378, 522 *A.*2d 405 (1987); *State v. Kelly,* 97 *N.J.* 178, 210, 478 *A.*2d 364 (1984); *Romano v. Kimmelman,* 96 *N.J.* 66, 80, 474 *A.*2d 1 (1984); *State v. Marcus,* 294 *N.J.Super.* 267, 274, 683 *A.*2d 221 (App.Div.1996). General acceptance in the field, not universal agreement, is the critical factor for finding that there is a sufficient scientific basis to produce uniform and reliable results. *See State v. Spann,* 130 *N.J.* 484, 509–10, 617 *A.*2d 247 (1993). There are three ways to prove general acceptance: (1) through expert testimony; (2) authoritative scientific literature; or (3) persuasive judicial opinions. *See State v. Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364; *State v. Marcus, supra,* 294 *N.J.Super.* at 275, 683 *A.*2d 221.

 "The court's function is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." *Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 414, 605 *A.*2d 1079 (1992). Even when expert testimony is admitted, however, the opposing party may still challenge the reliability of the particular procedures followed in the individual case. The trier of fact then decides what weight to accord the testimony. *See State v. Hurd, supra,* 86 *N.J.* at 543, 432 *A.*2d 86. Expert testimony should not be excluded merely because it fails to account for some condition or fact that the opposing party considers relevant. That party may, on cross-examination, supply the omitted conditions or facts and ask the expert if his or her opinion would be changed by them. *See State v. Freeman,* 223 *N.J.Super.* 92, 116, 538 *A.*2d 371 (App.Div.1988).

 Applying these principles here, we find that no error occurred in allowing Tucker to testify regarding his modified use of the Coe graph and in allowing defendant to vigorously cross-examine him on this point. In front of the jury, Tucker conceded that Coe's method would have produced a later estimated time of death, presumably late enough to cover defendant's partial alibi,

and that Tucker had never published anything in this particular field. Tucker, however, also explained why he believed that his own method was sound.

In *State v. Zola,* 112 *N.J.* 384, 412, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989), the Supreme Court found a sufficiently reliable basis for admitting the testimony of the State's serologist regarding the amylase level in the victim's vagina even though the expert's measurements had been derived by modifying the standard chemical test used for determining the presence of amylase. The Court noted that the defense had not disputed the expert's qualifications, the efficacy of the test modification, or the validity of the test results. *See ibid.* While the defense did dispute the certainty of the modified test, it did not dispute the principles on which it was based. *See ibid.; cf. Bahrle v. Exxon Corp.,* 279 *N.J.Super.* 5, 34, 652 *A.*2d 178 (App.Div.1995) (finding that the trial court properly excluded testimony by an expert who conceded that the methodology that he used had never been used by experts in any field, that he was not familiar with any approved methods, and that he departed from the accepted procedures not to improve on them but because he was not aware of them), *aff'd,* 145 *N.J.* 144, 678 *A.*2d 225 (1996).

The instant situation is more similar to *Zola* than it is to *Bahrle.* Tucker provided an explanation for why he had rejected and modified Coe's linear method, his scientific expertise was never challenged, and his reliance on the vitreous potassium test to estimate time of death was generally accepted within the scientific community. Only his interpretation of one particular set of data was in dispute. While Coe had plotted the data and had an opinion on how to interpret it, there was no basis for saying that Coe's opinion was the only acceptable one. Moreover, unlike Coe, Tucker was the medical examiner who had examined the victim as well as the murder scene. Hence, we conclude that the question was a legitimate factual one for the jury to resolve. The judge did not err in permitting this testimony.

■ Even if the judge did err in admitting this testimony, however, the error would be harmless because Tucker arrived at his estimated time of death by looking at four separate factors, only one of which was the vitreous potassium level. He also considered the victim's body temperature, degree of rigor mortis, and lividity. Moreover, Tucker made it clear that the time of death was only an estimate and that it was stated within a given range of several hours. Coe's methodology affected only one of the four factors and would have similarly produced only an estimated time range.

## VI.

Defendant's third point of error is that the judge's supplemental instruction on reasonable doubt, which diverged from the model jury charge, diluted the State's burden of proof. Defendant contends that this was reversible error. We disagree.

## A.

The judge's initial charge on reasonable doubt mirrored the model jury charge as it appeared then. Defendant concedes that the original charge was free of error. The model jury charge at that time read as follows:

> Reasonable doubt is not a mere possible or imaginary doubt, because everything relating to human affairs is open to some possible or imaginary doubt.
>
> A reasonable doubt is an honest and reasonable uncertainty as to the guilt of the defendant existing in your minds after you have given a full and impartial consideration to all of the evidence. It may arise from the evidence itself or from a lack of evidence.
>
> [*Model Jury Charge (Criminal)*, Reasonable Doubt (1994).]

The day after the judge gave the charge to the jury, the jury requested a readback of some of the testimony. The jury also asked the court to redefine reasonable doubt. The judge redefined reasonable doubt for the jury as follows:

> *Webster defines reasonable as governed by or in accordance with sound thinking within the bounds of common sense, not extreme or excessive.* When we use the term reasonable doubt, we're not talking about a possible doubt or an imaginary

doubt, because everything that we deal with in life is open to some possible doubt or some imaginary doubt, *and truly you can conjure up doubt about any proposition that you care to think about. You can find some doubt about that. That's not what we're talking about.*

We're talking about an honest uncertainty regarding the guilt of the defendant that exists in your minds after you have fairly and impartially considered all of the evidence in the case. And that reasonable doubt may arise from the evidence itself or from the lack of evidence.

[ (Emphasis added).]

The jury reached a verdict the following afternoon.

Defendant argues that the supplemental charge was unbalanced in the State's favor, improperly relied on a dictionary definition, and impermissibly suggested that a substantial doubt was required in order to find defendant not guilty. Defendant suggests that the imbalance arose because there was only one sentence explaining what reasonable doubt is but three or four sentences explaining what it is not. The dictionary definition of "reasonable" was improper, according to defendant, because it is the legal definition that must control. Since the word "reasonable" was isolated from the term "reasonable doubt" and the judge stated that "reasonable" is something other than "extreme" or "excessive," this suggested that substantial doubt was required to acquit. These errors, according to defendant, were compounded because they were set forth in response to a jury question and in a supplemental charge, which, according to defendant, are given greater attention by a jury.

## B.

A reasonable doubt instruction must be analyzed in its entirety. *See State v. Medina,* 147 *N.J.* 43, 51–52, 685 *A.*2d 1242 (1996), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 1476, 137 *L.Ed.*2d 688 (1997); *State v. Marshall,* 123 *N.J.* 1, 135, 586 *A.*2d 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). Taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury. *See Victor v. Nebraska,* 511 *U.S.* 1, 6, 114 *S.Ct.* 1239, 1243, 127 *L.Ed.*2d 583, 591 (1994); *State v. Medina, supra,* 147 *N.J.* at 51–52, 685 *A.*2d 1242. "Only

those instructions that overall lessen the State's burden of proof violate due process." *State v. Medina, supra,* 147 *N.J.* at 52, 685 *A.*2d 1242.

A jury instruction that fails to communicate the State's burden to prove guilt beyond a reasonable doubt requires reversal. *See Sullivan v. Louisiana,* 508 *U.S.* 275, 278–81, 113 *S.Ct.* 2078, 2081–83, 124 *L.Ed.*2d 182, 189–90 (1993); *State v. Medina, supra,* 147 *N.J.* at 50, 685 *A.*2d 1242.

Our courts have repeatedly cautioned against using jury charges that have a tendency to "understate or trivialize" the duty to find guilt beyond a reasonable doubt. *See State v. Medina, supra,* 147 *N.J.* at 50–51, 685 *A.*2d 1242; *State v. Purnell,* 126 *N.J.* 518, 545, 601 *A.*2d 175 (1992); *State v. Biegenwald,* 106 *N.J.* 13, 41, 524 *A.*2d 130 (1987). In order to "avoid problems in the future," our Supreme Court in *State v. Medina, supra,* adopted a reasonable doubt charge from which trial courts may not deviate:

> The [State] has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases, where you were told that it is necessary to prove only that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> A reasonable doubt is an honest and reasonable uncertainty in your minds about the guilt of the defendant after you have given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence. It is a doubt that a reasonable person hearing the same evidence would have.
>
> Proof beyond a reasonable doubt is proof, for example, that leaves you firmly convinced of the defendant's guilt. In this world, we know very few things with absolute certainty. In criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you are not firmly convinced of defendant's guilt, you must give defendant the benefit of the doubt and find him not guilty.
>
> [147 *N.J.* at 60–61, 685 *A.*2d 1242.]

"The failure to adhere to the definition, over an objection, runs the risk of reversible error." *Ibid.*

Despite finding error in the judge's charge, the Court in *Medina, supra,* did not reverse. The Court stated that:

> Although some parts of the charge were incorrect, when read in its entirety, the charge does not violate due process. The court adequately explained that Medina was innocent until proven guilty and that the State must prove his guilt beyond a reasonable doubt. It told the jury that a reasonable doubt was "that which arises from a fair and rational consideration of the evidence or perhaps from the lack of evidence." Despite the regrettable errors, the charge did not so infect the instruction as to lower the State's burden of proof.
>
> [147 *N.J.* at 55–56, 685 *A.*2d 1242.]

While the necessity of using the charge adopted by the Court in *State v. Medina, supra*, is prospective, the analysis used by the Court to determine whether a particular charge meets constitutional muster is applicable to the present case. It is under this analytic framework that we examine the judge's charge and supplemental charge to the jury.

## C.

The judge's original jury charge was correct in all respects. The supplemental charge also contained some of the model language but added to it in two minor respects. We find that as a whole the judge's charge did nothing to lessen the State's burden of proving defendant guilty beyond a reasonable doubt.

We agree with defendant that a court should not ordinarily give the jury a dictionary definition of "reasonable." And we note that, under *State v. Medina, supra*, no dictionary definition will ever again be used. Defendant argues, however, that the judge's definition of "reasonable" reduced the State's burden of proof. We disagree. Using the dictionary definition that reasonable means "in accordance with sound thinking within the bounds of common sense, not extreme or excessive," does not lessen the State's burden of proving defendant guilty beyond a reasonable doubt.

Defendant's reliance on *Alvarez v. People*, 653 *P.*2d 1127 (Colo. 1982), is misplaced. In that case, one juror consulted a dictionary for definitions of the terms "reasonable," "doubt," "imaginary," and "vague." The following day, she discussed those definitions with another juror. The Colorado Supreme Court found this to be

improper because the words may not have significance as legal concepts when used in everyday parlance and because the jurors were bound to accept the judge's definition of reasonable doubt and to obtain clarifications of any ambiguities in terminology from the court, not from extraneous sources. *See id.* at 1131.

Here, the jurors did not look to extraneous sources for clarification but to the judge. When a trial judge resorts to a dictionary for clarification, he or she has control over what information is then imparted to the jury. In *Alvarez,* there was no way of knowing what the jurors learned from consulting the dictionary or, more importantly, how they used that information.

## VII.

In defendant's fourth point, he contends that his conviction must be reversed because the State repeatedly made improper references to his pre-arrest silence as substantive proof of guilt. The issue of whether it is proper to admit evidence of pre-arrest silence as substantive evidence of guilt requires extensive analysis. It is a subject that has not been considered by our Supreme Court or the Supreme Court of the United States. Another panel of this court has previously held that evidence of pre-arrest silence is not admissible as substantive evidence of guilt. *See State v. (Shelton) Marshall,* 260 *N.J.Super.* 591, 597, 617 *A.2d* 302 (App.Div.1992). We respectfully disagree. We conclude that the admission of evidence about defendant's pre-arrest silence as substantive evidence of guilt did not violate any constitutional right and was not error. Further, even if the inclusion of this evidence was error, it was harmless beyond a reasonable doubt.

## A.

The evidence in question was elicited, over defense objections, on direct examination of the investigating officers. The testimony was that, during the early stages of the investigation, defendant never asked about the status of the investigation, the cause of his wife's death, or whether the police had any suspects.

Defense counsel, in his summation, argued that if defendant had asked more about the investigation and the cause of his wife's death, the State would have found that to be suspicious. "It's sort of a damn if you do, damn if you don't situation. If you don't ask, then they try to draw an innuendo because you haven't asked." Counsel also suggested that defendant had remained stoic for his sons' sake when he found his wife dead and that the family had retired early on the night of the murder because they were so drained. Defendant wanted to get back into his house as soon as possible because his sons were anxious to return to their home.

During its summation, the State commented:

One of the first things, and we touched on that briefly, that someone wants to know in that position, that position of an innocent victim, the innocent spouse, of someone who's been killed, are the questions we talked earlier, the condition of his wife. First thing has to be, did she suffer? I mean that is has [sic] the first thing that comes to mind? He had the opportunity to talk to the police at numerous times, number one. Number two, what's going on? What are you guys doing? Was [sic] the status of the investigation? Two of the most logical things that should have come up which never came up.

When he is in the presence of the police at his parents' house at 5:25 on January 2. He sees Tom Ramsey in front of his house at 7:30. He sees Condus at 9:15 when he brings the dogs. He's at the Chatham police headquarters at midnight for a number of hours. He's at the Chatham Police Headquarters the following day prior to seven o'clock as they're making arrangements to get the house turned over. He's in the company of the police at his house after seven o'clock on the third. Police visit him on January fifth, there is nothing, never asked. No follow up calls. Did she suffer? What are you guys doing to find out who killed my wife.

Immediately prior to concluding his summation, the prosecutor again noted:

No time during the investigation did John Dreher ever ask what happened to his wife of 15 years. Never asked if did she suffered [sic], never ask if she was raped. Never asked if she was tortured. He didn't have to, he knew, he had inside information. He was the ultimate insider, he knew what happened to his wife, he knew she had suffered, he knew she had been strangled, he knew she had been stabbed. He didn't ask any questions about his wife because he didn't have to. He already had all the answers.

Recall that defendant made the following comment to Detective Ramsey: "I thought she was hit in the head with the shoe thing

but the papers said she was strangled."[16] Also recall that Ramsey found that this comment was suspicious because he had given orders not to release information regarding the metal cobbler's shoe last to anyone outside of the investigation, and the victim's head injuries would not have been visible upon first entering the basement.

In *Griffin v. California,* 380 *U.S.* 609, 615, 85 *S.Ct.* 1229, 1233, 14 *L.Ed.*2d 106, 110 (1965), the United States Supreme Court held that, under the Fifth Amendment, a prosecutor cannot comment on a defendant's decision not to testify at trial and cannot use that silence as evidence of guilt. The Court did not address the admissibility of non-coercive, pre-arrest silence.

The admissibility of evidence about a defendant's pre-arrest silence can be fairly split into two different realms: use of the evidence for impeachment purposes; and use of the evidence as substantive evidence of guilt. The use of pre-arrest silence for impeachment purposes has a well-developed jurisprudence, while the use of pre-arrest silence as substantive evidence of guilt has led to fragmented, inconsistent decisions.

### B.

■ Using pre-arrest silence to impeach a defendant does not violate either the Fifth Amendment prohibition against self-incrimination or the Fourteenth Amendment guarantee of due process. *See Jenkins v. Anderson,* 447 *U.S.* 231, 238, 240, 100 *S.Ct.* 2124, 2129, 2130, 65 *L.Ed.*2d 86, 94–95, 96 (1980). In *Jenkins,* the defense theory was that the victim had been killed in self-defense. Both on cross-examination of the defendant and in closing argument, the prosecutor referred to the defendant's two-week delay in reporting the incident. Without deciding whether there were circumstances under which pre-arrest silence may be protected by the Fifth Amendment, the Court concluded that once a defendant

---

[16] We note that defendant did not challenge the inclusion of his statement into evidence.

chooses to "cast aside his cloak of silence" by testifying, the truth-finding function of a criminal trial prevails in the balance of considerations determining the scope and limits of the privilege against self-incrimination. *See id.* at 238, 100 *S.Ct.* at 2129, 65 *L.Ed.*2d at 94–95.

Similarly, because no governmental action can be found that induces a defendant to remain silent prior to his arrest, using his silence to impeach him cannot violate due process. *See id.* at 240, 100 *S.Ct.* at 2130, 65 *L.Ed.*2d at 96. The Court noted that "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Id.* at 239, 100 *S.Ct.* at 2129, 65 *L.Ed.*2d at 95. The Court further noted that is was up to each jurisdiction to formulate its own rules of evidence for determining under which circumstances such evidence will be admissible. *See ibid.*

In a concurring opinion, Justice Stevens noted that the privilege against compelled self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak. *See id.* at 241, 100 *S.Ct.* at 2131, 65 *L.Ed.*2d at 96 (Stevens, J., concurring). According to Justice Stevens:

> When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment.... I would simply hold that the admissibility of petitioner's failure to come forward with the excuse of self-defense shortly after the stabbing raised a routine evidentiary question that turns on the probative significance of that evidence and presented no issue under the Federal Constitution.
>
> [*Id.* at 243–44, 100 *S.Ct.* at 2132, 65 *L.Ed.*2d at 98 (Stevens, J., concurring).]

Justice Stevens recognized that, under his approach, assuming that the evidence was relevant, such evidence can also be used, "not only for impeachment but also in rebuttal *even had [a defendant] not taken the stand.*" *Id.* at 244 n. 7, 100 *S.Ct.* at 2132 n. 7, 65 *L.Ed.*2d at 98 n. 7 (Stevens, J., concurring) (emphasis added).

In New Jersey, the privilege against self incrimination is not part of our Constitution. Rather, it is codified as part of our evidence rules. *See N.J.R.E.* 503. New Jersey's privilege against self incrimination is generally regarded as offering broader protections than its federal constitutional counterpart. *See generally State v. Strong,* 110 *N.J.* 583, 595, 542 *A.*2d 866 (1988); *Dunn v. Borough of Mountainside,* 301 *N.J.Super.* 262, 693 *A.*2d 1248 (App.Div.1997).

In *State v. Deatore,* 70 *N.J.* 100, 108–09, 113 and n. 8, 358 *A.*2d 163 (1976), our Supreme Court held that a defendant who remains silent, or who fails to volunteer exculpatory information at or near the time of his arrest, may not be cross-examined regarding such silence in order to permit an inference that his exculpatory testimony at trial is untrue. Subsequently, in *State v. Brown,* 118 *N.J.* 595, 573 *A.*2d 886 (1990), the Supreme Court addressed the admissibility for impeachment purposes of evidence of pre-arrest silence that significantly preceded an arrest.

 The *Brown* Court concluded that, under New Jersey law, [A] defendant has no right *not* to speak prior to arrest. We are also of the view, however, that a defendant has no duty *to* speak prior to arrest. Simply, there is no legal constraint one way or the other—either to speak or not to speak—prior to an arrest. Consequently, evidence of pre-arrest silence, particularly in the absence of official interrogation, does not violate any right of the defendant involving self-incrimination.... Thus, in effect, the probative worth of such pre-arrest silence should be considered objectively and neutrally, without added coloration attributable to any legal right in such silence.

[*Id.* at 613, 573 *A.*2d 886 (citations omitted).]

Accordingly, "pre-arrest silence may be admitted for impeachment purposes provided that no governmental compulsion is involved." *Ibid.*

 If it can be inferred that "a reasonable person situated as the defendant, prior to arrest, would naturally have come forward," especially when this is viewed in light of the defendant's exculpatory testimony, "then the failure to have done so has sufficient probative worth bearing on defendant's credibility for purposes of impeachment." *Id.* at 613–14, 573 *A.*2d 886. Stated

another way, the evidence is admissible if "it generates an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony." *Id.* at 615, 573 *A.*2d 886.

## C.

As noted, the use of pre-arrest silence as substantive evidence of guilt has not been addressed by either the United States Supreme Court or the New Jersey Supreme Court. In *State v. Marshall, supra,* 260 *N.J.Super.* at 597, 617 *A.*2d 302, one panel of this court found that evidence of pre-arrest silence could not be used as substantive evidence of guilt. That panel noted that the *Brown* Court did not expressly state whether a defendant's pre-arrest silence is admissible as substantive evidence of guilt where the defendant does *not* testify. *See ibid.* In *Marshall, supra,* our colleagues concluded that "[i]f evidence of a defendant's pre-arrest silence is not admissible to prove consciousness of guilt when he testifies, *a fortiori* such evidence is not admissible for that purpose if he does not testify and therefore is not available to explain his silence." *Id.* at 597, 617 *A.*2d 302. Our colleagues concluded that because the defendant did not testify at trial, the State should not have asked the jury to consider his pre-arrest silence for any purpose. *See ibid.*

We respectfully disagree with our colleagues' reasoning in *Marshall, supra.* Our Supreme Court in *Brown, supra,* delineated the circumstances under which pre-arrest silence can be used for impeachment purposes. Our colleagues in *Marshall, supra,* reasoned that because the *Brown* Court proscribed the use of pre-arrest silence as substantive evidence of guilt in the impeachment context, there could never be an instance under which one could use such evidence as substantive evidence of guilt. We disagree.

By way of example, we note that under *N.J.R.E.* 609, a witness's credibility can be impeached by evidence of a prior conviction of a crime. A jury must be instructed that they cannot

consider a defendant-witness's conviction as substantive evidence of defendant's guilt. *See State v. Manley,* 54 *N.J.* 259, 271, 255 *A.*2d 193 (1969). Under *N.J.R.E.* 404(b), however, this same evidence can be introduced "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *Ibid.* Thus, although in one context, evidence must be limited to impeachment, under other circumstances it can be used as substantive evidence.

We read the proscription in the *Brown* decision against the use of pre-arrest silence as substantive evidence of guilt as an articulation of the principle that impeachment evidence in general should never be used as substantive evidence of guilt. Furthermore, we note that the *Brown* Court explicitly found that evidence of pre-arrest silence that significantly precedes arrest does not implicate the constitutional or codified right against self incrimination. In sum, we find that *Brown, supra,* does not mandate the result reached in *Marshall, supra.*

The federal circuits are split on the issue of whether pre-arrest silence can be used as substantive evidence of guilt. Some circuits have held that the use of such silence comes within the proscription of commenting on the privilege against self-incrimination. *See, e.g., United States v. Burson,* 952 *F.*2d 1196, 1200–01 (10th Cir.1991), *cert. denied,* 503 *U.S.* 997, 112 *S.Ct.* 1702, 118 *L.Ed.*2d 411 (1992); *Coppola v. Powell,* 878 *F.*2d 1562, 1567–68 (1st Cir.), *cert. denied,* 493 *U.S.* 969, 110 *S.Ct.* 418, 107 *L.Ed.*2d 383 (1989); *United States ex rel. Savory v. Lane,* 832 *F.*2d 1011, 1018 (7th Cir.1987). Other circuits have held that, where the silence is neither induced by nor in response to governmental action, the Fifth Amendment is not applicable. *See United States v. Thompson,* 82 *F.*3d 849, 855 (9th Cir.1996).[17] *But see United States v.*

---

[17] In *Thompson, supra,* the lack of clarity in the law was used as a basis for holding that the lower court's failure to exclude the evidence could not be deemed "plain error." *Id.* at 856. The *Thompson* Court quoted language from a

*Caro,* 637 *F.*2d 869, 876 (2d Cir.1981) (holding, without discussion, that *Jenkins, supra,* could not be extended to allow use of pre-arrest silence as part of the government's direct case but that the error was harmless). Still other circuits have held only that, once a defendant volunteers to be interviewed, he cannot keep from the jury the fact that he selectively disclosed certain information and then chose to "clam up." *See United States v. Davenport,* 929 *F.*2d 1169, 1174–75 (7th Cir.1991), *cert. denied,* 502 *U.S.* 1031, 112 *S.Ct.* 871, 116 *L.Ed.*2d 776 (1992); *see also State v. Carroll,* 256 *N.J.Super.* 575, 601, 607 *A.*2d 1003 (App.Div.) (finding it permissible to introduce evidence that, after a certain point in a post-arrest interrogation, the defendant invoked his right to remain silent because it showed a logical end to the interrogation), *certif. denied,* 130 *N.J.* 18, 611 *A.*2d 656 (1992).

In *United States v. Zanabria,* 74 *F.*3d 590 (5th Cir.1996), the defendant did not testify at trial but presented a defense of duress through the testimony of other witnesses. The arresting officer testified that, prior to his arrest, the defendant said nothing about threats against his daughter or that he was in trouble. The prosecutor used this testimony to rebut the duress defense. *See id.* at 593. The Fifth Circuit held, without deciding whether pre-arrest silence fell within the reach of testimonial communications protected by the Fifth Amendment, that the silence at issue in *Zanabria* was neither induced by nor in response to any governmental action. *See ibid.* While the Fifth Amendment protects against compelled self-incrimination, it does not preclude the proper evidentiary use of every communication, or lack thereof, by a defendant that may give rise to an incriminating inference. *See ibid.* We find that this logic is compelling and echoes the correct sentiments expressed by Justice Stevens in his concurring opinion in *Jenkins, supra.*

---

Second Circuit case in which the court concluded: "we do not see how an error can be plain error when the Supreme Court and this court have not spoken on the subject, and the authority in other circuits is split." *Id.* at 855 (quoting *United States v. Alli–Balogun,* 72 *F.*3d 9, 12 (2d Cir.1995)).

## D.

We begin our substantive analysis by echoing Justice Stevens' concurrence in *Jenkins v. Anderson, supra,* that where there is no governmental compulsion associated with a defendant's silence, evidence of that silence should be allowed in for any relevant purpose regardless of whether the defendant takes the stand. We also note that in *State v. Brown, supra,* our Supreme Court found that "evidence of pre-arrest silence, particularly in the absence of official interrogation, does not violate any right of the defendant involving self-incrimination." 118 *N.J.* at 613, 573 *A.*2d 886.

In the case at bar, the silence about which the State commented was not compelled, and thus, its admissibility does not rise or fall on self-incrimination grounds. The admissibility of defendant's pre-arrest silence must be adjudged on the basis of its relevance.

*N.J.R.E.* 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *Ibid.* In ascertaining the relevance of evidence, the focus should be on "the logical connection between the proffered evidence and a fact in issue." *State v. Hutchins,* 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div.1990). Under *N.J.R.E.* 403, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." *Ibid.*

The State's position is that defendant's silence was conduct that was indicative of guilt and that conduct that indicates consciousness of guilt, or is inconsistent with innocence, is admissible. *See State v. Mills,* 51 *N.J.* 277, 286, 240 *A.*2d 1 (holding that it was not error to include evidence about the defendant's visit to the grave side of one of his victims), *cert. denied,* 393 *U.S.* 832, 89 *S.Ct.* 105, 21 *L.Ed.*2d 104 (1968); *State v. Millett,* 272 *N.J.Super.* 68, 88, 639 *A.*2d 352 (App.Div.1994); *see also State v. Pindale,* 249 *N.J.Super.* 266, 283, 592 *A.*2d 300 (App.Div.1991) ("[t]he rule applies only to

such conduct as is intrinsically indicative of a consciousness of guilt, such as unexplained flight, or an unusual exhibition of remorse for the victim of the crime, or the switching of clothes with a cell mate before a lineup").

In *Pindale, supra,* we found that the absence of remorse is *not* necessarily probative of guilt. That is, the absence of remorse may be "more probative of a clear conscience, albeit callous, uncaring and unsympathetic." *Ibid.* The determination of whether this type of evidence is admissible must depend on the specific facts of a case. The question will always be one of relevance. For example, in *State v. Cerce,* 22 *N.J.* 236, 245–46, 125 *A.*2d 689 (1956), the State was allowed to show that, when informed of his wife's murder, the defendant reacted without any noticeable emotional disturbance. The Court held that such apathy and indifference permitted an inference that defendant had knowledge of the crime and was hurt by his wife's betrayal of their marriage. *See ibid.* Also, the State was allowed to introduce evidence that, when the officers came to arrest him, the defendant asked to finish shaving and asked no questions about the reasons for his arrest. "That knowledge was already his." *Ibid.*[18]

Here, it was defendant's silence, not just his emotional demeanor, that the State used against him. Arguably, there is very little difference between telling a jury that defendant reacted with no emotion to his wife's death and telling them that he asked no questions about her death. Moreover, the difference between conduct and silence is irrelevant when it occurs at a time substan-

---

[18] Defendant is not challenging the State's use of the lack of remorse shown by him following his wife's murder. That is, the State was allowed to show that defendant reacted with almost no show of emotion when he found his wife's body, when he called in the murder to the police, when he told his son about the murder, when he visited the funeral home to make burial arrangements, when he encountered his wife's friends in the weeks following the murder, and when he showed more concern for the condition of his property than for the condition of his wife. All of that evidence was properly admitted.

tially prior to arrest when our courts have held that the privilege against self-incrimination does not attach.

With the exception of one statement that defendant made to the police in his house on the day following the murder—that he thought that his wife had been killed with the cobbler's last, but the newspapers reported it as a strangulation—defendant said nothing about the murder itself. This is important because the police never told defendant anything about the cobbler's last, and the press, as noted, reported that the cause of death was strangulation. Also, there is evidence that defendant could not have known about the cobbler's last without doing extensive investigating in the basement upon discovering his wife's body, which he did not have time to do and which he specifically indicated that he had not done.

Because defendant suggested to the police that he thought that his wife had been killed in a certain manner, without having a basis for making the suggestion, the fact that defendant never asked any further questions about the manner of her death became probative of his guilt. A jury could clearly infer from this evidence that defendant had knowledge of the method of his wife's murder.

Defendant claims, without offering reasons, that if the evidence was relevant and admissible, it should have still been excluded because its probative value is outweighed by its undue prejudicial effect. We find that the probative value of this evidence outweighs any possible prejudicial effect. It appears that the prejudicial effect upon which defendant raises his objection is that the inference between his pre-arrest silence and his guilt is too attenuated. We reject this argument. If defendant had not made his statement to the police that he thought that his wife had been killed by the cobbler's last, the inference necessary to sustain the evidence would be different. That hypothetical is not before us. Consequently, the evidence was admissible.

While we find no error in the inclusion of the evidence about defendant's pre-arrest silence, we also find, in light of all the evidence, that if the inclusion was error, it was harmless beyond a reasonable doubt. *See State v. Macon*, 57 *N.J.* 325, 338, 273 *A.*2d 1 (1971).

## VIII.

In his fifth point, defendant contends that the Morris County Prosecutor's Office (MCPO) impermissibly ordered the Chatham Township Police Department (CTPD) to destroy hand-written notes of police officers, despite a written policy in the CTPD's policy manual, that written notes were to be maintained. Defendant argues that the judge erred when he denied defendant's motion to dismiss his indictment due to the destruction of the police officers' written notes. We reject that argument. "Once the grand jury has acted, an 'indictment should be disturbed only on the 'clearest and plainest ground,' ' and only when the indictment is manifestly deficient or palpably defective." *State v. Hogan*, 144 *N.J.* 216, 228–29, 676 *A.*2d 533 (1996) (citations omitted). Defendant has failed to demonstrate that the indictment here was itself manifestly deficient or palpably defective.

The question thus becomes whether the destruction of police notes precludes the investigators' testimony that used final reports that incorporated information contained in the field notes that were destroyed. We conclude that it does not.

Prior to trial, the judge conducted an eleven-day hearing (Lett I hearing) concerning the policies and practices of individual members of the CTPD and the MCPO with respect to note-taking, report preparation, and filekeeping systems. Although that hearing was designed to flush-out alleged improprieties pertinent to Austin Lett's proffered testimony, the evidence presented in that pre-trial hearing also applied to defendant's motion to preclude testimony about defendant's interviews during the first three days following Gail Dreher's murder.

At the conclusion of the Lett I hearing, the judge concluded that the note destruction was designed to reduce paperwork, avoid confusion, and enhance legibility. The judge found that there was no need to preserve rough shorthand or handwritten notes taken at the scene of an interview as long as the information contained in those notes was accurately reflected in a more legible, formal document. Applying that decision to the motion brought to suppress defendant's statements, the judge ruled that any failure on the part of the CTPD to preserve its original notes could be used by the defense in its cross-examination of the officers in question but that testimony of the investigating officers who had destroyed their notes after preparing formal reports would not be precluded. We agree with that decision.

In *California v. Trombetta*, 467 *U.S.* 479, 104 *S.Ct.* 2528, 81 *L.Ed.*2d 413 (1984), the Supreme Court held that whenever potentially exculpatory evidence is permanently lost, courts face the difficult task of determining the importance of materials whose contents are unknown and often disputed. *See id.* at 486, 104 *S.Ct.* at 2533, 81 *L.Ed.*2d at 421. The Court cited with approval the approach taken in *Killian v. United States*, 368 *U.S.* 231, 82 *S.Ct.* 302, 7 *L.Ed.*2d 256 (1961), *reh'g denied*, 368 *U.S.* 979, 82 *S.Ct.* 476, 7 *L.Ed.*2d 441 (1962), where the issue was the destruction of the preliminary notes of an FBI agent. The *Killian* Court stated that there was no constitutional violation implicated by such a destruction as long as the notes were made only for the purpose of transferring data and if, after having served that purpose, they were destroyed by agents "in good faith and in accord with their normal practice." 368 *U.S.* at 242, 82 *S.Ct.* at 308, 7 *L.Ed.*2d at 264. The *Trombetta* Court adopted this standard and further held that, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." 467 *U.S.* at 488, 104 *S.Ct.* at 2534, 81 *L.Ed.*2d at 422.

The Supreme Court revisited the issue in *Arizona v. Youngblood*, 488 *U.S.* 51, 109 *S.Ct.* 333, 102 *L.Ed.*2d 281 (1988), *reh'g*

*denied,* 488 *U.S.* 1051, 109 *S.Ct.* 885, 102 *L.Ed.*2d 1007 (1989). The Court concluded that it was unwilling to read the fundamental fairness requirement of the due process clause as imposing on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance. *See Arizona v. Youngblood, supra,* 488 *U.S.* at 58, 109 *S.Ct.* at 337, 102 *L.Ed.*2d at 289. Instead, a showing of bad faith was required because this would limit the extent of the State's obligation to preserve evidence to "reasonable bounds" and would confine it to cases where the interests of justice clearly require it. *See ibid.*

Our own courts have identified three factors on which to focus in determining whether a due process violation has occurred when there has been suppression, loss, or destruction of physical evidence: (1) the bad faith or connivance by the government; (2) whether the evidence was sufficiently material to the defense; and (3) whether the defendant was prejudiced. *See State v. Holland-er,* 201 *N.J.Super.* 453, 479, 493 *A.*2d 563 (App.Div.), *certif. denied,* 101 *N.J.* 335, 501 *A.*2d 983 (1985). To be material, the "evidence must both possess an exculpatory value that was apparent before [it] was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta, supra,* 467 *U.S.* at 489, 104 *S.Ct.* at 2534, 81 *L.Ed.*2d at 422; *State v. Hollander, supra,* 201 *N.J.Super.* at 479–80, 493 *A.*2d 563.

In *State v. Hunt,* 25 *N.J.* 514, 525, 138 *A.*2d 1 (1958), our Supreme Court held that a defendant had the right to examine a police officer's notes where the officer refreshed his recollection with those notes prior to trial. The Court held that, "where it appears that a State's witness has made prior notes or statements relating to the subject matter of the direct testimony which he has given, the defense is entitled to inspect and use on cross-examination the prior notes or statements if they are or can be made available." *Id.* at 531, 138 *A.*2d 1. The Court did not conclude, however, that the State had a duty to preserve such notes. Moreover, in the instant case, the officers did not rely on their

notes during their direct testimony. Rather, they relied only on their formal typewritten reports, which were provided to the defense during discovery.

More analogous is the case of *State v. Bohuk*, 269 *N.J.Super.* 581, 636 *A.*2d 105 (App.Div.), *certif. denied,* 136 *N.J.* 29, 641 *A.*2d 1040, *cert. denied,* 513 *U.S.* 865, 115 *S.Ct.* 183, 130 *L.Ed.*2d 117 (1994). There, we held that the State's intentional destruction of the notes relating to fingerprint evidence did not deny defendant due process because the destruction had no impact on the defendant's opportunity to attack the State's evidence. *See id.* at 597, 636 *A.*2d 105. We noted that the defense had been provided with all 107 photographs of potential fingerprints as well as the investigator's written report and that there was no evidence that the notes had any exculpatory value or were otherwise material. *See ibid.* Additionally, there was no suggestion in the record that the notes had been destroyed in bad faith. *See ibid.*

In *State v. Zenquis*, 251 *N.J.Super.* 358, 370, 598 *A.*2d 245 (App.Div.1991), *aff'd*, 131 *N.J.* 84, 618 *A.*2d 335 (1993), while reversing the conviction on other grounds, we noted that the trial court should have made findings concerning whether the failure to preserve a police officer's notes was done in bad faith. Nevertheless, we found no undue prejudice to the defendant's rights where the trial court had instructed the jury that if it found that the officer had "destroyed his notes at a time when he knew the case was proceeding to trial, it could infer that the notes contained information inconsistent with the witness's trial testimony." *Id.* at 370, 598 *A.*2d 245.

Although the judge here did not conduct a separate inquiry into the destruction of notes regarding interviews with defendant, the judge did conduct an extensive hearing regarding Austin Lett. Based on the Lett I testimony, the judge concluded that the destruction of those notes had not been done in bad faith and that the officers had a legitimate recordkeeping reason for destroying redundant paperwork that took up space and was often illegible. Particularly significant was Ramsey's testimony. According to

Ramsey, his officers were told to review their previously-retained notes and to make sure that their typed versions were totally accurate before disposing of the notes. Ramsey personally checked any handwritten notes against the final report when a report was given to him for review.

Defendant nevertheless suggests that bad faith can be inferred from the fact that the MCPO issued an internal memorandum in May 1987, apparently right before defendant was indicted, which indicated that handwritten notes may be destroyed once a final report is prepared and which cautioned the investigators that all such notes that are retained were discoverable and would be furnished to defense attorneys. Defendant argues that this memo proves that the MCPO's suggestion to the CTPD that they destroy their notes was done in bad faith because it was done solely to avoid discovery obligations. We disagree.

The memo does not permit an inference of bad faith. As noted, the State is under no obligation to preserve handwritten reports prepared by officers in the field. Our discovery rules require only that the State provide to the defense any "police reports that are within the possession, custody, or control of the prosecutor." *R.* 3:13–3(c)(8). Internal reports, memos, or documents that are deemed work product are not discoverable. *See R.* 3:13–3(e). While the Constitution requires that exculpatory evidence known to the prosecution be disclosed to the defense, defendant cannot presume from the State's practice of destroying handwritten notes after formal reports have been prepared that exculpatory evidence is deliberately and in bad faith being destroyed.

At trial, defendant vigorously cross-examined the officers on this issue. It was brought to the jury's attention that, at some time prior to May or June 1986, Ramsey had agreed to go along with the idea suggested by the MCPO that all handwritten notes of his officers be destroyed. Ramsey gave the official order to destroy the notes. He testified that any notes that had not been typed up were not destroyed.

Ramsey admitted that the CTPD operating manual then in existence provided that crime scene notes "should be retained until final disposition and/or appeal of the case." Ramsey also indicated that he issued his directive after consultation with the police chief who had promulgated the original policy manual.

The jury was fully aware of the written policy and the decision circumventing that policy. It was free to draw any inference from that testimony favorable to defendant. We find no error.

## IX.

In defendant's sixth point, he argues that the judge erred in allowing Austin Lett to testify at trial because the State destroyed crucial evidence of an interview with Lett prior to his undergoing hypnosis. According to defendant, even if evidence of Lett's pre-hypnotic recollection was admissible despite the improprieties of the hypnotic procedure, the evidence should have been excluded because the prosecution misrepresented the substance of that pre-hypnotic recollection. We disagree.

The issue first arose prior to trial when the defense alleged that the written summary provided by the State to the hypnotist contained references to interviews with Lett that had occurred on January 3 and 7, 1986. The defense was aware only of the January 4 interview. Also, the information recorded in the police report of the January 4 interview differed from that contained in the summary given to the hypnotist. Finally, the defense had evidence to suggest that the police officer who had interviewed Lett on January 4 had discarded her rough notes after the draft of her report was prepared but before the final version was completed.

The State represented to the judge that it was aware of only one interview with Lett and that this interview occurred on January 4, 1986. References to any other dates in the summary given to the hypnotist were erroneous. There were differences between what was contained in the police report and what was

contained in the summary because the summary had been deliberately left vague so that the hypnotic process would not be tainted.

The judge found no bad faith in the State's destruction or withholding of evidence that would cause material prejudice to defendant and ruled that the issue was one to be dealt with during cross-examination. On an interlocutory appeal, on August 10, 1993, we reversed and remanded the matter to the trial court for an evidentiary hearing.

As noted, the judge conducted an eleven-day hearing, the Lett I hearing, on various dates between November 29 and December 15, 1993. At the end of this hearing, the judge concluded that the allegedly missing reports never existed and that Lett had not been interviewed on the days alleged by the defense.

The judge ruled that the defendant had the burden of persuasion to prove that the State had not turned over every piece of discoverable evidence that it had in its possession. Applying the preponderance of evidence standard, the judge ruled that defendant had failed to meet its burden.

The judge specifically considered the credibility of every witness who testified at the hearing, including their ability to recall, their ability to communicate, their body language, facial expressions, and their expressions of nervousness or hesitation. The judge found Officer Goeckel to be a credible witness. Although her memory was incomplete, it was aided by documents that she had prepared contemporaneously with the events. Additionally, the judge found that Goeckel had taken handwritten notes of her interview with Lett on January 4, 1986, and that she deliberately destroyed them once her typewritten rough draft had been prepared. Consistent with his prior ruling that there was no need to preserve preparatory notes once those notes have been incorporated into a formal report, the judge concluded that Goeckel's field notes were entirely and accurately subsumed in her typewritten draft, which she contemporaneously prepared.

Turning to the two-page summary given to the hypnotist, the judge noted that although no one had admitted writing it, Allman and another officer had admitted giving input to its substance. Allman claimed that he had intended the information contained therein to be accurate, but no one ever said that it was in fact accurate. The judge concluded that the information contained in this summary was in fact inaccurate. There was nothing else whatsoever before the judge that suggested that Lett had been interviewed on either January 3 or 7, 1986, or that any of the inaccurate information was correct. Moreover, the judge found that the document was intended to be vague so as not to taint the hypnotic session. In addition, it was never intended to be an official report. The fact that it was so carelessly prepared was probably the reason that no one would take credit for writing it. In any event, the judge ruled that carelessness in its preparation could be used by the defense during its cross-examination to affect the credibility of witnesses at trial.

Hence, the judge concluded that because there was no interview with Lett on January 3 or 7, 1986, there was never any report of such an interview that could have been lost or destroyed. The "arcane interpretation" suggested by the defense was simply not borne out by the facts. Accordingly, defendant's motion to exclude Lett's testimony was denied.

We agree entirely with the judge's assessment. The judge had the firsthand opportunity to assess the credibility of the twenty-three witnesses that appeared before him over the course of eleven days. His conclusion that no police reports had been lost or destroyed was supported by the overwhelming weight of the evidence presented at the hearing. While defendant tried to get someone to admit that Lett had been interviewed on a date other than January 4, 1986, he failed in that endeavor. He similarly failed in his endeavor to substantiate any of the other inconsistencies.

We also agree with the judge that the information contained in the two-page summary given to the hypnotist was never intended

to be a full recitation of the details that Lett gave to the police. While it should not have contained inaccurate information, the fact remains that it did. The document was never intended to be an official report and which had been hastily prepared, apparently by officials in the MCPO who did not fully understand the legal ramifications of attempting to elicit hypnotically refreshed testimony from a witness.

Moreover, as will be more fully explained in our discussion of defendant's seventh point of error, the hypnotist spoke to Lett at length before placing him under hypnosis. His pre-hypnotic recollection, then, had been well-documented before he ever underwent the procedure. There was simply nothing before the judge, not even an inference or suggestion, much less any concrete proof, that Lett ever made inconsistent statements at some other time. Hence, there was no basis on which the judge could have ruled that Lett's testimony was inadmissible. Here, there was no proof that anything had been lost or destroyed, much less anything of material value to the defense.

All that the law requires is that the police act in good faith and that nothing of material value be withheld so as to deny a defendant due process under the law. *See Arizona v. Youngblood, supra,* 488 *U.S.* at 58, 109 *S.Ct.* at 337, 102 *L.Ed.*2d at 289. In the absence of bad faith, relief should be granted to a defendant only where there is a "showing of manifest prejudice or harm" arising from the failure to preserve evidence. *De Vitis v. New Jersey Racing Comm'n,* 202 *N.J.Super.* 484, 494, 495 *A.*2d 457 (App.Div.), *certif. denied,* 102 *N.J.* 337, 508 *A.*2d 213 (1985).

We therefore reject defendant's arguments concerning the loss or destruction of notes regarding Lett's pre-hypnotic recollection.

## X.

In defendant's seventh point, he argues that Lett's trial testimony should have been excluded because it was tainted by an improper hypnotic procedure. Alternatively, he argues that he is

entitled to a new hearing on this issue because the judge errone-ously excluded the testimony of defendant's document examiner.

This issue was raised in defendant's first appeal and decided against him. *See Dreher I, supra,* 251 *N.J.Super.* at 308–15, 598 *A.*2d 216. At the hearing held prior to the first trial, the judge determined that the hypnosis had been conducted in violation of many of the guidelines enunciated in *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981), and that the statements made by Lett while under hypnosis—that he saw defendant's car at 9:35 a.m. and that he could recognize defendant as the driver of the car—would be excluded. In *Dreher I, supra,* the State did not dispute that ruling. Instead, it argued that the portion of Lett's testimony that recited events recalled prior to the hypnotic session—that he saw defendant's car, but not the driver, at 9:35 a.m.—was admissi-ble. 251 *N.J.Super.* at 308–09, 598 *A.*2d 216.

We agreed with the State that Lett's testimony about his pre-hypnotic recall was properly admitted and that the great majority of decisions elsewhere have concluded that, even where hypnoti-cally enhanced testimony is otherwise inadmissible, a witness may testify as to matters "demonstrably recalled and related" prior to hypnosis. *Id.* at 310–11, 598 *A.*2d 216. We noted that at the *Hurd* hearing held prior to trial, defendant had offered no scienti-fic basis for why Lett could not reliably testify as to his pre-hypnotic recollection. Although defendant, on appeal, argued that Lett's testimony had been tainted, he had not offered any expert testimony to back up that argument. *See id.* at 310, 598 *A.*2d 216. We noted that defendant's view that a hypnotized witness is contaminated and incompetent to testify even as to pre-hypnotic events was an extreme one and was followed at that time only in California. *See id.* at 311–12, 598 *A.*2d 216.

Instead, we followed the approach taken by the New York courts. According to that approach:

> [I]t is recognized that a major difficulty arises because a hypnotized witness acquires increased confidence in his recollections which could then inhibit a defendant's right of cross-examination. This difficulty warrants a pretrial inquiry and a resolution of two particular issues: (1) the extent of the witness's pre-

hypnotic recall; and (2) the degree to which the hypnosis itself was so "impermissibly suggestive as to require exclusion of in-court testimony with respect to prehypnotic recollection."

[*Dreher I, supra,* 251 *N.J.Super.* at 312, 598 *A.*2d 216 (quoting *People v. Hughes,* 59 *N.Y.*2d 523, 466 *N.Y.S.*2d 255, 453 *N.E.*2d 484, 496 (1983)).]

At such a pretrial hearing, any evidence that is material to the determination under the first prong should be received. *See ibid.* With regard to the second prong, those guidelines that are used by experts in the field of hypnosis should be used as a basis for assessing suggestibility. *See ibid.* The *Dreher I* court noted that the New York approach had been adopted, with minor variations, in numerous states, even those that do not allow post-hypnotic testimony. *See id.* at 313–15, 598 *A.*2d 216 (citations omitted).

Prior to the second trial, defendant moved for a *"Hughes"* hearing, a two-prong hearing adopted by New York in *People v. Hughes, supra.* The State argued that the hearing should be limited instead to scientific evidence regarding taint because Lett's pre-hypnotic recollection had already been preserved on videotape. After reviewing the videotape, the judge ruled that the only issue to be determined was whether scientific evidence showed that the suggestiveness of a hypnotic procedure could taint someone's pre-hypnotic testimony.

We summarily reversed on an interlocutory appeal, in which we stated that the judge, on remand, "shall allow the presentation of evidence on both prongs of the *Hughes* standard and shall not limit the hearing to the presentation of expert testimony." This hearing (Lett II hearing) was conducted on twelve days between May 31 and June 28, 1994. At the conclusion of the hearing, the judge ruled that Lett's testimony was admissible.

The judge noted that the State had again conceded that *Hurd* had been violated and that Lett's hypnotically induced statements were inadmissible. The judge concurred with the earlier rulings made by the first trial judge that neither Lett's pre- nor post-hypnotic testimony was tainted by the hypnotic procedure and that hypnosis had not impaired defendant's ability to cross-examine Lett. The judge found Lett to be an extremely credible

witness; he did not try to embellish or guess while he testified, and he had been consistent from the time that he first spoke to the police, through his pre-hypnotic session, through the first trial, and now before the second trial. He answered questions directly and precisely, and judging from his voice tone, body language,.and tempo, he was not deceptive. While the certainty of the events had been reinforced by Lett's repeated testifying, that was part of the human condition and the trial process.

Additionally, the judge found that Lett's alcoholism could be used to cross-examine him at trial, but that it did not substantially affect his ability to perceive, recall, and recount the events about which he had testified.[19] There was no evidence that Lett had been drinking or under the influence on the morning on which he had made his observations.

Both experts that appeared at the hearing agreed that: the recounting of events is likely to lead to new facts being remembered, some accurate and some not; the repeating of one's recollection will reinforce details; there is a real issue of confabulation under hypnosis; and the hypnotist had violated the *Hurd* guidelines. The judge further found that, during the ·pre-hypnotic session, Lett would not allow himself to be swayed by the hypnotist and that he often disagreed with him.

Furthermore, Lett's modification of the time frame, based on his reconstruction of what he did that morning, was consistent with the opinion of both experts that there would be an increase in information whenever a topic is repeatedly recounted. While the State had mishandled the manner in which the hypnosis was conducted, including the presentation to the hypnotist of a two-page summary that contained inaccurate details and for which no one now wanted to take credit, the violations had not been intentional. There had been no deliberate attempt to circumvent

---

[19] The court had also reviewed, in camera, the records from Lett's rehabilitation treatment center, which had been compelled by the defense.

*Hurd.* Defendant's motion to exclude Lett's testimony was therefore denied.

In *State v. Fertig,* 143 *N.J.* 115, 668 *A.*2d 1076 (1996), our Supreme Court restated and reaffirmed *Hurd* 's six basic prerequisites to the admissibility of hypnotically refreshed testimony. These requirements include: (1) that a psychiatrist or psychologist experienced in hypnosis conduct the session; (2) that the professional be independent of either the State or the defense; (3) that all information recalled prior to hypnosis be recorded; (4) that the hypnotist obtain a detailed description from the subject of what he remembers prior to hypnosis, and that the expert avoid asking structured questions or adding new details; (5) that all contacts between the hypnotist and the subject be recorded, including before, during, and after hypnosis; and (6) that no one else be present before, during, and after hypnosis. *See id.* at 120–21, 668 *A.*2d 1076 (citing *State v. Hurd, supra,* 86 *N.J.* at 545–46, 432 *A.*2d 86).

Despite the number of years that had elapsed since the *Hurd* guidelines had been developed, and the number of states that had considered hypnotically enhanced testimony to be inadmissible *per se,* the Court declined to abandon the guidelines and instead held that they should continue to be used on a case-by-case basis to determine whether such testimony is admissible. *See State v. Fertig, supra,* 143 *N.J.* at 124–26, 668 *A.*2d 1076.

Here, as in *Dreher I,* the issue is not the admissibility of hypnotically enhanced testimony. Rather, it is the extent to which a suggestive hypnosis procedure has so tainted a witness's prehypnotic recollection as to render his testimony inadmissible at trial. In this regard, the issue has been analogized to that presented by a tainted witness "who has been exposed to an impermissibly suggestive out-of-court identification procedure." *Dreher I, supra,* 251 *N.J.Super.* at 312–13, 598 *A.*2d 216:

> In the case of identification testimony, an in-court identification of the accused is allowed where the State can show a sufficient independent source for such testimony and that the witness's recollection springs, not from the suggestive

procedure, but from his or her own opportunity to view the accused at the time of the crime.

[*Id.* at 313, 598 *A.*2d 216 (citations omitted).]

In admitting testimony about matters recalled and related before a witness was hypnotized, a court may consider the following factors: the extent to which the pre-hypnotic recollections have been recorded; the degree to which the witness had confidence in his pre-hypnotic recollection; the extent of the witness's belief that hypnosis will yield the truth; the type of questioning employed; and "any other factor relevant to determining whether hypnosis so enhanced the witness's confidence in his original recollection as to substantially impair the opposing party's right to cross-examination." *Id.* at 311, 598 *A.*2d 216.

The Lett II hearing comported in all respects with the type of inquiry envisioned by this court in *Dreher I.* Defendant was able to explore Lett's pre-hypnotic recall, Lett's present recall, Lett's alcoholism, the hypnotist's incompetence and suggestive behavior, the State's incompetence in setting up the session, and the State's incompetence in allowing ten minutes of the session to go unrecorded. More importantly, defendant was able to explore the debate among scientists regarding the effects that hypnosis has upon one's ability to distinguish between actual recall and confabulation.

From the moment that Lett was first interviewed by the police until the time that he testified at the Lett II hearing, he never wavered from his belief that he had seen defendant's car somewhere around 9:15 or 9:30 a.m. He had testified so many times that it would have been impossible to identify what he "remembered that he remembered" before he was hypnotized. His current recall had become so "scrambled," as defendant's expert put it, not because of the hypnosis, but because he had been asked to recount and recall the event on so many occasions. The problems with Lett's recall in 1994 was not that he had been hypnotized in 1986 but that he had been asked to restate his story so many times in those intervening years.

As the State's expert credibly and cogently testified, as the judge found, and as even the *Hurd* Court recognized, problems with confabulation and increased confidence in the validity of one's "new recall" occur regardless of hypnosis. That is, these problems are part and parcel of the process of reconstructing a past event. *See State v. Hurd, supra,* 86 *N.J.* at 540–41, 432 *A.*2d 86. Memory is an active process that often introduces inaccuracies not present in the initial recollection or even in the event itself. Hence, the mind will confabulate or fill in gaps in memory "so that the total picture will make sense or conform to the subject's subconscious expectation of what must have occurred." *Id.* at 541, 432 *A.*2d 86. "Rather than require historical accuracy as a condition for admitting eyewitness testimony, we depend on the adversary system to inform the jury of the inherent weaknesses of the evidence." *Id.* at 542–43, 432 *A.*2d 86.

These comments are particularly apt here. As the State's expert commented, it is unlikely that Lett ever had the memory of the precise time that he saw defendant's car. That he could place the time within a fifteen-minute range seems accurate enough. His pre-hypnotic recall was recorded not only in the police reports but on videotape as well. When he changed his estimate from 9:15 a.m. to 9:25 a.m. or 9:35 a.m., he did so by reconsidering what other events had transpired that morning before he left for work. While the hypnotist suggested that Lett should think about some of these events, that suggestion took place before the hypnotic session ever began.

Defendant's argument that the judge erred by excluding his document examiner's testimony is clearly without merit. *R.* 2:11–3(e)(2). This issue had already been extensively explored at the Lett I hearing, and the judge took notice of all that prior testimony. We find no error in the judge's decision to exclude this testimony from the Lett II hearing.

## XI.

In defendant's eighth point, he contends that the judge erred in excluding bench notes contemporaneously-written by the

State's forensic chemist regarding the single sperm cell that she found on the slide from the victim's nasal smear. Defendant contends that this was "powerful documentary evidence" that provided "compelling evidence" that the victim had been sexually assaulted as well as murdered and that the murder had thus been committed not by defendant, who had had a vasectomy, but by another man. The State responds that the jury heard lengthy testimony from the chemist regarding her observation, that her observation was confirmed by two supervisors, and that the judge did not abuse his discretion in excluding this single piece of cumulative evidence. After an exhaustive review of the record, we find that defendant's contention on this point is without merit. R. 2:11–3(e)(2). We add the following comments.

All laboratory reports were admitted into evidence. The judge, however, refused defendant's request to admit the notes. According to defendant, these notes were admissible as statements of a party opponent, as business records taken in the ordinary course of business, or as official State records. The judge ruled that while some of the notes may constitute business records, this was a situation where the chemist had been in court to testify. The mere fact that the evidence was a business record did not mean that it had to be admitted, especially where the jury had the benefit of hearing the testimony.

The judge described the bench notes as consisting of thirteen pages that were replete with scientific terms, terms of art, and abbreviations. The judge found that they would be of no particular use to the jury and that they would only tend to confuse the issue, rather than shed light on it.

A trial court has broad discretion under *N.J.R.E.* 403 to exclude otherwise admissible evidence where its probative value is substantially outweighed by the risk of undue prejudice, confusion of issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. *See State v. McDougald,* 120 *N.J.* 523, 577–78, 577 *A.2d* 419 (1990). Those were the precise concerns identified by the judge in making his

decision to exclude this evidence. We find no abuse of discretion here.

## XII.

In defendant's ninth point, he contends that the judge erred when it allowed a police officer to testify that he had not heard any "street information" regarding the murder of defendant's wife, thereby suggesting that it was an inside job. According to defendant, this testimony was not only "rank hearsay" but, depending on who the sources were for this street information, also "double, triple, or quadruple hearsay." After a thorough review of the record, and in light of applicable law, we are satisfied that Defendant's contention is without merit. *R.* 2:11-3(e)(2). We add the following comments.

This was not a situation where the logical implication to be drawn from the testimony was that a non-testifying witness had given the police evidence that defendant committed the crime. Rather, the only implication to be drawn from this evidence was that a non-testifying witness had given police evidence that a professional burglar, or someone else connected to the criminal milieu, did not commit the crime. It was never seriously contended, not even by defendant, that this was a "professional" crime, and the evidence introduced at trial certainly did not support such a theory.

Moreover, this was a fleeting reference made by one out of forty witnesses who testified for the State in a trial that lasted for more than thirty days. Defendant objected only to the question that asked Ramsey whether any information had been obtained from the street. Without objection, Ramsey defined street information and stated that he had attempted to get such information here. In the context of this protracted trial, then, we find that any error that did occur here was incapable of producing a verdict that the jury would not have otherwise reached. *See R.* 2:10-2.

## XIII.

In his tenth point, defendant contends that the judge erred in failing to conduct an adequate inquiry into allegations that the jury had been improperly influenced by extraneous information. In light of our exhaustive review of the record, we find defendant's contention on this point to be without merit. *R.* 2:11–3(e)(2). We add the following comments.

On May 3, 1995, the day after defendant had rested and the evidentiary portion of the case had concluded, the judge received an anonymous typewritten letter that stated:

> Judge Smith,
>
> I have been in the presence of and overheard the blonde woman juror who sits in the back row on the end of the jury box. She has referred to information about the Dreyer [sic] case that has not been introduced in the courtroom.

The judge notified the attorneys of the letter and thought it best, in light of the letter's anonymity and lack of specifics, that no further action be taken. Defense counsel asked the judge to interview the juror in question on the record and out of the presence of counsel. The judge agreed to do so. The juror told the judge that the letter might have been written by someone from her workplace because people there had tried to talk to her about the case and she had had to stop some people in mid-sentence. The juror had gotten angry at some of her colleagues at work for blurting out things to her when she had told them not to. She said some of her colleagues had said nasty things, such as "hang him," but that she had explained to them that her decision had to be based on what she heard in the courtroom.

The juror also told the judge that she had not said anything to anyone about the case other than when it would probably be over; she had said nothing about the contents of the case. She assured the judge that her decision would be based only on what she heard in the courtroom. It saddened her to think that she would be dismissed as a juror, but she felt that such an outcome would be better than declaring a mistrial after everybody's hard work. She felt that she had tried to stop any kind of comments to her from

people who were reading about this case, "but when you work in a company with 2,000 people, it's very difficult to stop."

The judge then asked the juror if she had ever shared the information that she heard with any of the other jurors. The juror replied that she had not. When the judge asked the juror about the substance of the information that she had heard at work, she stated that she had been told, "I don't know why it's taking you so long, he was found guilty once, what's the problem?" The juror told the judge that "people are very cruel" to say things like that, and "I didn't know if it was true, I didn't know if it wasn't true." She stated that she was "[d]isregarding it because it's really neither here nor there." The juror stated that someone in her office might have overheard the comment that her co-worker made to her and might have written the letter to the judge, especially because work was particularly stressful with the juror being out so much during the trial.

The judge then discussed the matter with the attorneys. The judge summarized what the juror had said about her co-workers' jealousies and frictions and that they sometimes blurted out things to her about the case. One of those things was to the effect that defendant had already been convicted once before. Nevertheless, the juror claimed that she would decide the case based only on what she had heard in the courtroom, and the judge absolutely believed her.

"Out of an abundance of caution," and consistent with his position that knowledge of the outcome of the prior trial would disqualify a juror, defense counsel felt constrained to ask the judge to disqualify the juror. The judge "very reluctantly" agreed to do so. It noted that she had been an enthusiastic juror and would have been valuable to either side. The juror was then called in and dismissed from further duty. As she was leaving, she reminded the judge that she did not feel she had been guilty of any misconduct.

The juror assured the judge that she would not discuss anything with the remaining jurors on her way out. She also said that she

would comply with the judge's request not to discuss anything about the case with anyone until the verdict was in. She once again assured the judge that she had a great deal of respect for the process and that she took her job as a juror seriously.

After the verdict, defendant moved for a new trial on the ground of juror misconduct, or alternatively asked to be allowed to examine all the jurors. The defense had obtained the previously sealed transcript of the judge's full conversation with the juror. Based on that transcript, the defense contended that the juror had made references to the jury being "sloppy about things" and remembering certain things, and that these could have been references to defendant's prior conviction. In addition, the juror had mentioned learning from a court aide, Bob, that defendant had been talking to one of the jurors. The defense was fearful that the court aide had created the false impression that defendant was trying to influence the jury.

The judge denied defendant's motion. It noted that it had instructed the jury at length not to discuss the case among themselves or with others. In addition, the court's personnel reminded jurors where to go and with whom not to interact. The judge also observed that defendant took every opportunity at trial to speak to everyone involved, including the attorneys, witnesses, court aides, and judge, in a pleasant way, just to pass the time of day. That was his "mannerism." It would not have surprised the judge if defendant had greeted the jurors as well. There was no basis, however, for defendant's suggestion that the court aide had done anything wrong.

The judge also noted that the dismissed juror had been quite talkative. She viewed herself as a potential leader and a conscientious juror. She referred to the "self-policing" that all jurors must abide by in order to follow the judge's instructions. The juror may have reminded others of this obligation, or she may have perceived herself as someone who should remind others. Either way, the judge was convinced that there was no hint of misconduct or any reference to the prior verdict. We agree.

 The issue is not whether the extraneous matters actually influenced the result but whether they had the capacity to do so. *See State v. Hightower,* 146 *N.J.* 239, 266–67, 680 *A.2d* 649 (1996); *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.2d* 302 (1951); *State v. Grant,* 254 *N.J.Super.* 571, 583, 604 *A.2d* 147 (App.Div. 1992); *State v. Weiler,* 211 *N.J.Super.* 602, 610, 512 *A.2d* 531 (App.Div.), *certif. denied,* 107 *N.J.* 37, 526 *A.2d* 130 (1986). A motion for a new trial on this ground, as any other new trial motion, is addressed to the sound discretion of the judge. *See Panko, supra,* 7 *N.J.* at 62, 80 *A.2d* 302.

 A criminal defendant's right to a fair trial requires that he be tried by a jury untainted by prejudice. *See State v. Biegenwald,* 106 *N.J.* 13, 32, 524 *A.2d* 130 (1987). "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.... [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *See Smith v. Phillips,* 455 *U.S.* 209, 217, 102 *S.Ct.* 940, 946, 71 *L.Ed.2d* 78, 86 (1982); *See also State v. Bey,* 112 *N.J.* 45, 81, 548 *A.2d* 846 (1988). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge be ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips, supra,* 455 *U.S.* at 217, 102 *S.Ct.* at 946, 71 *L.Ed.2d* at 86.

 There is no evidence whatsoever that the jury was subjected to any irregular influences. The sole juror who might have learned of the prior verdict was removed, and there was no hint that any other juror had similar knowledge.

 We also reject defendant's argument that the court aide's apparent statement that defendant had spoken to a juror meant that the aide was trying to turn the jury against him. As the judge noted, defendant had apparently spoken to many of the participants at trial but only in passing and only in the most courteous manner. The aide might simply have cautioned jurors

against talking to defendant, which was the aide's function. If defendant was trying to demonstrate to the jury that he was a decent human being, without taking the stand to testify, then, as the State points out, defendant has no one but himself to blame for this "irregular intrusion" into the jury's deliberations.

## XIV.

In defendant's eleventh point, he contends that the judge erred by refusing his request to instruct the jury that Nance Seifrit's brother, Nathan, was unavailable to testify. In light of our exhaustive review of the record, we find defendant's contention on this point to be without merit. *R.* 2:11–3(e)(2). We add the following comments.

While "a defendant is entitled to prove his innocence by showing that someone else committed the crime," *State v. Koedatich,* 112 *N.J.* 225, 297, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989); *State v. Millett,* 272 *N.J.Super.* 68, 98, 639 *A.*2d 352 (App.Div.1994), the proof offered must have the rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case. It is not enough if the evidence simply raises a possible ground of suspicion without providing any direct connection with the crime, or if it does nothing more than cast suspicions on a third party.

The judge found that there had been no evidence that Nathan Seifrit played any role in this murder. Nothing was produced that tied him to the murder scene or to the underlying circumstances in any way. Aside from counsel's comments, there was no connection between Nathan and the murder. Nance Seifrit could have had a lot of friends and relatives who might have worked in New Jersey on the date of the murder, but that fact did not prove anything more. In sum, other than "the rankest kind of speculation," there had been no connection between Nathan Seifrit and this case. We agree with the judge.

 We note that even if there was error, it was error that inured to defendant's benefit. That is, defendant was able to plant the seed of doubt that perhaps Nathan Seifrit, rather than defendant, was Nance's male accomplice. This suggestion was made to the jury despite the total absence of any proof. Such an instruction would have given this witness more significance than was warranted by the evidence. Also, nothing precluded the defense from having one of its own investigators testify regarding the efforts that were made to procure this witness for trial.

## XV.

In defendant's twelfth point, he contends that the judge erred by precluding the defense from cross-examining Investigator Allman regarding "an important exculpatory statement" contained in an affidavit that he had executed in support of an application for a search warrant. We hold that the judge's preclusion of this cross-examination was error. We also find, however, that it was harmless beyond a reasonable doubt.

This issue arose when the police made an application for a search warrant to get billing records for the Dreher's home telephone line. In their application, the police included an affidavit from Allman, who had interviewed Lois Wolkowitz, a friend of Gail Dreher.

Allman's five-page affidavit detailed the facts surrounding the murder and the status of the investigation to that point. Included among these facts was the following statement by Allman:

> During this ongoing investigation, Lois Wolkowicz [sic] . . . was interviewed and stated that on 1/2/86, she made approximately five telephone calls to the Dreher residence. . . . These calls were placed between the hours of 10:00 a.m. and 4:00 p.m. Two of these calls, Mrs. Wolkowicz [sic] stated that the telephone was picked up and an unidentified male answered the telephone.

Also, according to this affidavit, defendant did not have call forwarding on his phone, precluding the possibility that Wolkowitz's call had been answered at a different location. There was evidence at trial that, on the day of the murder, shortly after the police arrived at the crime scene, Wolkowitz called the Dreher

house asking to speak with Gail, and defendant had told her that his wife could not come to the phone. This evidence was potentially significant because defendant had an alibi for the time of day that Wolkowitz had allegedly heard the unidentified man's voice answer the phone.

During defendant's cross-examination of Allman, the investigator stated that, in submitting his affidavit in support of the warrant, he had tried to present accurate and reliable information to the court. Defendant then argued that he should be allowed to introduce that portion of Allman's affidavit that incorporated Wolkowitz's statement regarding the phone calls because such evidence constituted an admission of a party opponent. The State responded that Wolkowitz was available to testify and that her statement was not an adoptive admission by Allman. Moreover, although Allman had testified that his affidavit was reliable and accurate at the time that it was made, that testimony had to be viewed in the larger context of this investigation. At the time that the police reached out to get defendant's telephone billing records, the murder was only eight days old. The investigation continued for another one-and-one-half years until defendant was indicted.

The State also argued that Allman's statement had none of the indicia of reliability normally required to introduce hearsay testimony. The State represented to the court that, if Wolkowitz were called to testify, her testimony would be different from that contained within Allman's affidavit. Defense counsel replied that he was not aware that Wolkowitz had made any contradictory statement and that, in any event, the availability of the witness was irrelevant under the exception to the hearsay rule on which he was relying.

The State claimed that there was a discrepancy between Wolkowitz's own statement, in which only three phone calls are noted, and Allman's affidavit, in which five such calls are noted. In addition, the State claimed that when Wolkowitz had been interviewed by Detective Carlson, she gave him two or three contradictory statements about the calls. Finally, another neighbor, Ann

Noser, claimed that Wolkowitz told her something still different about these phone calls. Defense counsel argued that these contradictions went to the weight to be given Allman's testimony, not its admissibility. Defense counsel also noted that Carlson had interviewed Wolkowitz on January 2, yet that did not stop Allman from relying on her original statement when he prepared his affidavit eight days later.

The judge noted that, during the course of a criminal investigation, police discover many pieces of information, many of which may be used to find out who committed the crime. This does not mean, however, that the police vouch for the reliability of all this information. The information may be reliable only to the extent that it helps the police get to the next step in their investigation. Defense counsel responded that the difference here was that Allman had put this particular piece of information into a sworn affidavit.

The judge denied defendant's application to cross-examine Allman regarding his affidavit, noting that adoptive admissions are to be admitted with caution. In this case, the judge considered the following factors: that Wolkowitz was available to testify; that when Allman prepared his affidavit the law was not well settled that information contained therein could be used as adoptive admissions by the State; that Wolkowitz had given other statements in conflict with Allman's affidavit; and that Allman had not vouched for the truth or accuracy of the information contained within his affidavit. The judge noted:

> In the scheme of investigations, it seems to me it is the duty of the police officer to accept information that's provided to him and certainly to evaluate it and sift through it and then take it to the next step, see where the information goes. That's the nature of investigations and to put everything that is collected in that matter which may lead to another second investigation to be adoptive admission seems to me to go far beyond what the rule contemplates.

*N.J.R.E.* 803(b)(2) provides that the following statements are not excluded by the hearsay rule: "[a] statement offered against a party which is . . . a statement whose content the party has adopted by word or conduct or in whose truth the party has

manifested belief." This exception to the hearsay rule must be used with caution and only where the court is satisfied that all of the conditions for its application have been established by the proponent. *See Greenberg v. Stanley,* 30 *N.J.* 485, 498, 153 *A.*2d 833 (1959); *State v. Briggs,* 279 *N.J.Super.* 555, 562, 653 *A.*2d 1139 (App.Div.), *certif. denied,* 141 *N.J.* 99, 660 *A.*2d 1198 (1995); *Burbridge v. Paschal,* 239 *N.J.Super.* 139, 154–55, 570 *A.*2d 1250 (App.Div.), *certif. denied,* 122 *N.J.* 360, 585 *A.*2d 369 (1990).

The issue of whether the State should be deemed a party-opponent in a criminal prosecution has not been addressed in this state. The federal circuits have considered the issue and are split on its resolution.

In *United States v. Morgan,* 581 *F.*2d 933 (D.C.Cir.1978), the court noted that the federal rules contemplate that the federal government is a party-opponent of the defendant in criminal cases. *See id.* at 937 n. 10. Furthermore:

[W]hen the government authorizes its agent to present his sworn assurances to a judicial officer that certain matters are true and justify issuance of a warrant, the statements of fact or belief in the officer's affidavit represent the position of the government itself, not merely the views of its agent.

*[Ibid.]*

The *Morgan* Court cautioned that it was not deciding that any statement the agent might have made is admissible against the government. *Ibid.* Rather, its holding applied only to "statements in which the government had manifested its 'adoption or belief' because those statements stand on more solid ground than mere out-of-court assertions by a government agent." *Id.* at 938. Hence, where the government indicates "in a sworn affidavit to a judicial officer that it believes particular statements are trustworthy, it may not sustain an objection to the subsequent introduction of those statements on grounds that they are hearsay." *Ibid.; see also United States v. Warren,* 42 *F.*3d 647, 655 (D.C.Cir.1994); *United States v. Kattar,* 840 *F.*2d 118, 130–31 (1st Cir.1988).

In *United States v. Santos,* 372 *F.*2d 177, 180 (2d Cir.1967), however, the Second Circuit held that persons who testify for the prosecution in criminal cases, whether law enforcement agents,

investigators, or complaining witnesses, stand in relation to the government and the defendant no differently from persons who are unconnected with the development or success of the prosecution. Government agents are "supposedly uninterested personally in the outcome of the trial," and when the government prosecutes it does so on behalf of all the people of the United States. *Ibid.* Hence, "inconsistent out-of-court statements of a government agent made in the course of the exercise of his authority and within the scope of that authority" are not "admissions" as they would be upon an agent's principal in civil cases. *Ibid.*

More recently, in *United States v. Ramirez,* 894 *F.*2d 565, 570–71 (2d Cir.1990), the Second Circuit avoided revisiting the issue by holding that any error in the court's failure to admit into evidence affidavits prepared by a government agent in support of an application for a search warrant was harmless. The court noted that the information in the affidavits had been gathered at a preliminary stage in the investigation, was subject to change as the investigation progressed, and consisted of compilations of observations made by other officers. *Id.* at 571. Hence, they were not "overwhelmingly powerful evidence" in any event. *Ibid.* Moreover, the defendant had opted not to call the agent to testify. The affidavits might have been admissible had the agent been confronted with them. *See ibid.*

In *United States v. Kampiles,* 609 *F.*2d 1233, 1246 (7th Cir. 1979), *cert. denied,* 446 *U.S.* 954, 100 *S.Ct.* 2923, 64 *L.Ed.*2d 812 (1980), the Seventh Circuit held that nothing in the Federal Rules of Evidence suggested an intention to alter the traditional rule that, because government agents are disinterested in the outcome of the trial and unable to bind the sovereign, their statements are not the product of the adversarial process and not appropriately described as admissions. *See ibid.* The court distinguished *Morgan, supra,* because it dealt with a situation where "the Government had expressed its belief in the statement of the declarant." *United States v. Kampiles, supra,* 609 *F.*2d at 1246, n. 16.

■ We find that during the early stages of a prosecution, it is inappropriate to bind the prosecution with any and all statements made by its agents in the course of their employment. The statements, however, take on a different status when the government, by submitting the statements to a judicial officer for the issuance of a search warrant, manifests its belief in the truth of such statements. If the statements are reliable and accurate enough for one stage of the prosecution, the State should not be allowed to hide behind their arguable inaccuracy and unreliability at another stage of the prosecution. We note that, unlike *Ramirez, supra*, defendant offered the evidence while Allman was on the stand testifying. Thus, any inaccuracy in the statement could have been demonstrated to the jury and, as defense counsel below suggested, the weight to be given the statement could have been decided by the jury.

■ Nevertheless, for similar reasons to those noted by the court in *Ramirez, supra*, we find that the failure to admit Allman's affidavit here was harmless error. The information in the affidavit had been gathered at a very early stage in the investigation, was later shown to be inaccurate, and may not have even represented Allman's own personal interview with Wolkowitz. Hence, as in *Ramirez*, it would not have constituted overwhelmingly powerful evidence. If the evidence had been admitted, Allman could easily have provided adequate explanations for it. We find that the judge's ruling did not prejudice defendant to the extent that it caused the jury to reach a result it would not have otherwise reached. *See R.* 2:10–2.

### XVI.

■ In defendant's thirteenth point, he contends that the indictment should be dismissed because the State failed to apprise the grand jury of the existence and significance of exculpatory evidence and because it failed to insure that no grand juror had knowledge of defendant's prior conviction. We find defendant's contention on this point to be without merit. *R.* 2:11–3(e)(2).

Defendant does not accuse the prosecutor of withholding any knowledge about grand juror bias or interest, and he essentially contends that a grand jury must be *voir dired* in the same manner as a petit jury to assure that extraneous influences about the case have not infiltrated their deliberations. No such obligation on the part of either the prosecution or the Assignment Judge exists.

Affirmed.